Thomas D'Amore, OSB No. 922735
Email: tom@damorelaw.com
Benjamin Turner, OSB No. 144503
Email: ben@damorelaw.com
Amy Bruning, OSB No. 175811
Email: amy@damorelaw.com
D'AMORE LAW GROUP, P.C.
4230 Galewood Street, Suite 200
Lake Oswego, OR 97035
Telephone: (503) 222-6333

Michelle Burrows OSB 86160
Email:  michelle.r.burrows@gmail.com
LAW OFFICE OF MICHELLE R. BURROWS P.C.
16869 SW 65th Avenue # 367
Lake Oswego, OR 97035
Telephone: (503) 241-1955

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| SIERRA HASS, in her personal capacity; and ESTATE OF KENNETH HASS, by and through SIERRA HASS as its Personal Representative,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE OF OREGON, by and through its Oregon Health Authority and the Oregon State Hospital; SEJAL HATHI, MD; SARA WALKER, MD; JAMES PEYKANU, MD; RYAN BELL, MD; KYLE BOWERS, MD; LES CHRISTIANSON, DO; DOLORES MATTEUCI; POORNIMA RANGANATHAN, MD; RUBINA GUNDROO, MD; BHARGAV MUPPANENI, MD; JIGAR CHOTALIA, MD; ROBERT HIESTER, PMNHP; KAREN | Case No.<br><br>COMPLAINT<br>(Substantive Due Process; Personal Injury & Wrongful Death Action pursuant to 28 U.S.C. § 1332 and 42 U.S.C. § 1983)<br><br>DEMAND FOR JURY TRIAL |

Page 1 of 114 – COMPLAINT

JAMIESON, KELLY COCKROFT, RN,
MOFOLUWASHO ADENAKAN, RN;
MOHAMED DARAMI, LPN; NICOLE
OKEKE, RN; LETI ORTEGA; JOSEPH
KAMANDI;

Defendants.

COME NOW, the Plaintiffs and for their causes of action against Defendants, allege as follows:

## INTRODUCTION

1.      The Oregon State Hospital ("OSH" or "Hospital") provides patient centered, psychiatric treatment for adults. The Hospital's primary goal is to help people recover from their illness and return to the community.



2.      Kenneth Hass ("Mr. Hass") was involuntarily housed at OSH from February 2022 until his death in March 2025. During this time, Defendants made no attempt to properly diagnose coupled with repeated misdiagnosis. Defendants ignored reports by their own experts. Defendants repeatedly used improper medications including prescribing excessive doses of

certain medications. Defendants failed to arrive at a treatment plan. Defendants instead relied on the extensive use of isolation and four-point restraints.

3.      At the end of his life, Mr. Hass lived in isolation for 250 consecutive days. During this time, he was denied clean clothes and a shower and left in locked rooms smeared with feces and urine. During this time, he was a fall risk and would often drink dangerous amounts of water. Despite orders requiring constant observation, no one was allowed alone into his room to assist with medical emergencies.

4.      Practitioners decided early that Mr. Hass was untreatable. He was kept heavily medicated and in isolation where even family members were not allowed to visit. During the last hours of his life, he was repeatedly allowed to engage in dangerous, life threatening behavior. No one stopped him or helped him, despite repeated requests by staff.

5.      Mr. Hass's death was caused by extreme neglect and abuse throughout his stay at OSH.

**PARTIES**

6.      Plaintiff Sierra Hass ("Ms. Hass") is a resident of Lane County, Oregon and the sister of Mr. Hass.

7.      Ms. Hass was duly appointed as the Personal Representative for the Estate of Kenneth Hass in Marion County on May 22, 2025.

8.      In addition to serving as Personal Representative for her brother's estate, Ms. Hass is asserting negligent infliction of emotional distress and fraud claims on her own behalf.

9.      Defendant State of Oregon is a political entity whose primary public health agency is the Oregon Health Authority ("OHA") a duly authorized agency of Defendant State of Oregon. Oregon Health Authority manages OSH, the primary public psychiatric hospital in the

State of Oregon. OSH is responsible for housing, psychiatrically treating, and ensuring the safety and security of all patients under its care.

### Management Staff

10. Defendant Sejal Hathi, MD, was the Director of OHA and responsible for management and supervision at OSH.

11. Defendant Sara Walker, MD, was the Superintendent and Chief Medical Officer ("CMO") of OSH. Defendant Walker is also a psychiatrist who provided care and treatment to Mr. Hass including extensive isolation orders.

12. Defendant Karen Jamieson was the Chief Financial Officer ("CFO") of OSH and made decisions concerning funding for treatment to Mr. Hass.

13. Defendant Dolores Matteucci was Superintendent of OSH and was responsible for review and investigation of complaints made by Mr. Hass as well as management of his care through the supervision of medical staff.

### Treating Doctors

14. Defendant James Peykanu, MD, is a psychiatrist who treated Mr. Hass at OSH during the relevant times.

15. Defendant Ryan Bell, MD, is a psychiatrist who provided care and treatment to Mr. Hass at OSH. Defendant Bell was the Chief Psychiatrist at OSH.

16. Defendant Les Christianson, DO, is a physician who provided care and treatment to Mr. Hass at OSH including extensive isolation orders.

17. Defendant Kyle Bowers, MD, is a physician who provided treatment and care to Mr. Hass at OSH including substantial isolation orders.

18. Defendant Poornima Ranganathan, MD, is a physician who provided treatment and care to Mr. Hass at OSH including substantial isolation orders.

19.     Defendant Rubina Gundroo, MD, is a physician who provided treatment and care to Mr. Hass at OSH including substantial isolation orders.

20.     Defendant Bhargav Muppaneni, MD, is a physician who provided treatment and care to Mr. Hass at OSH including substantial isolation orders.

21.     Defendant Jigar Chotalia, MD, is a physician who provided treatment and care to Mr. Hass at OSH including substantial isolation orders.

22.     Defendant Robert Hiester, PMNHP, is a Psychiatric Mental Health Nurse Practitioner who provided treatment and care to Mr. Hass at OSH including substantial isolation orders.

**Nursing Staff & Technicians**

23.     Mohamed Darami LPN, is a Licensed Practical Nurse who provided care, supervision and treatment to Mr. Hass at OSH.

24.     Kelly Cockroft, RN, is a Registered Nurse who provided care, supervision and treatment to Mr. Hass at OSH. Defendant Cockcroft provided supervision to subordinate medical staff who were assigned to care for Mr. Hass. She is also the lead on the emergency response team in the final event that led to Mr. Hass's death.

25.     Mofoluwasho Adenekan, RN, is a Registered Nurse who provided care, supervision and treatment to Mr. Hass at OSH.

26.     Joseph Kamandi is a medical technician who provided care, supervision and treatment to Mr. Hass at OSH.

27.     Leti Ortega was a medical provider who provided care, supervision and treatment to Mr. Hass at OSH.

28.     Nicole Okeke, RN, is a Registered Nurse who provided care and supervision to Mr. Hass at OSH. Ms. Okeke was involved in the final hours of Mr. Hass's life. Her decisions played a role in his death.

**John Does**

29.     John Does 1-15 are individuals who were responsible for the administration of the OHA, were responsible for the administration of OSH, provided care, or assisted in care for Mr. Hass who may not be identified at this time. Plaintiffs will amend to include those defendants once the identification of each defendant is made known.

**JURISDICTION AND VENUE**

30.     This Court has subject matter jurisdiction over Plaintiff Estate of Kenneth Hass's claims of violation of federal constitutional rights pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the causes of action arise under 42 U.S.C. § 1983. This Court has jurisdiction over Plaintiffs' supplemental state law claims under 28 U.S.C. § 1367.

31.     Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon and because Defendants are subject to personal jurisdiction in the District of Oregon.

32.     Plaintiff Estate of Kenneth Hass sent a Notice of Tort Claim to the State of Oregon on or about June 16, 2025, pursuant to ORS 30.275(5). Mr. Hass also filed two distinct written notices about neglect and his conditions on May 15, 2023, and May 21, 2024. Each notice was denied after approximately two days of review by Defendant Matteucci and Defendant Walker.

**STATEMENT OF FACTS**

**Psychiatric Care in Oregon**

**I.     The Oregon Health Authority**

33.     OHA was established by the Oregon legislature in 2009. OHA oversees most of Oregon's health related programs including the Public Health Division, the Behavioral Health Division, and OSH.

34.     OHA is led by a director, Defendant Hathi. The OHA Director oversees the agency's operations through ten deputy directors, including a behavioral health director and the Superintendent of OSH, Defendant Walker.

**II.     The Oregon State Hospital**

35.     OSH was established to house and treat the "insane" in 1862. OSH has operated continuously on its original site in Salem. It is designed to house those found guilty but insane in criminal matters, criminal defendants who are awaiting evaluations or not competent to aid in their defense, and those voluntarily or involuntarily civilly committed.

36.     OSH provides patient centered, psychiatric treatment for adults from throughout the State of Oregon who need hospital level care. Services include psychiatric evaluation, diagnosis, and treatment. OSH has two campuses, one in Salem and one in Junction City. OSH serves more than 1,500 people per year and employs more than 2,000 staff. The Salem campus has the capacity to serve up to 558 people at a time.

37.     OSH provides 24-hour, on-site care provided by nursing, psychiatric, and other credentialed professional staff, as well as treatment planning, pharmacy, laboratory, food and nutritional services, vocational, and educational services. The Hospital is accredited by the Joint Commission on the accreditation of health organization ("TJC").

38.      Accreditation by TJC is a voluntary process which provides an evaluation of member healthcare organizations in specific performance areas. TJC accreditation is an objective evaluation process involving on-site survey by a TJC team of surveyors who assess the organization's compliance with TJC standards. If the survey is successful and the organization is in compliance, the organization can receive certification. Surveys are conducted every three years.

39.      OSH has been the subject of litigation and public investigations for many years:

    a.      Federal judges found delayed care and treatment in 2002 and 2019 in *Oregon Advocacy Center v. Mink* and in 2021 in *Bowman v. Matteucci*. The Hospital was found in contempt for failure to timely provide care in "Aid and Assist" evaluations. The Hospital was found in contempt for repeated failure to comply with court orders addressing care and treatment at OSH.

    b.      In 2004, an investigation revealed that the Hospital was overcrowded and contained outdated equipment, accepted wrongful admissions, suffered from severe understaffing, and failed to properly investigate assaults and limit violence in the Hospital.

    c.      In 2005, after an outside investigation, the Hospital's physical plant was deemed structurally unsafe. That same year, the Oregon Advocacy Center filed a federal action alleging overcrowding and understaffing, which posed a risk to patients and staff.

    d.      In 2006, OSH was fined over $10,000 for asbestos violations that caused health problems in staff and patients.

e.    A 2007 investigation by the Oregon legislature found that over 5,000 canisters of unclaimed human remains were reported stored in the Hospital. Most of the canisters were corroded and leaking. It was determined that approximately 1,500 sets of remains were permanently lost.

f.    In 2007, the legislature funded $458 million to construct a replacement hospital, the number of beds was ordered to be reduced to 320 or fewer, and a second state psychiatric hospital was built in Junction City.

g.    In 2008, the U.S. Department of Justice filed a report criticizing the quality of care at the Hospital following the death of a patient. The Hospital was mandated to complete several significant improvements, including enhanced patient monitoring and increased medical and nursing staffing levels.

h.    In 2012, construction on the new hospital in Salem was completed, increasing capacity to 620 beds.

i.    Since 2020, there have been 21 patient deaths in the Hospital. Nine of the deaths were "unexpected." There were reportedly high rates of violence, altercations between staff and patients, and failure to investigate incidents, including injuries.

j.    In 2022, federal regulators found serious issues with food storage, cleanliness, and improper labeling of medications.

k.    Also in 2022, the Hospital settled a lawsuit addressing overcrowding, resulting in a long term federal injunction against new admissions during overcrowded conditions.

l.  In 2024, the State contracted with Chartis for $1.7 million to assist the Hospital to come into compliance with TJC following repeated failures.

m.  In March 2025, TJC found numerous serious violations of the standard of care, violations of the law on timely care, adequate staffing, overuse of restraint and isolation, poor charting, and generally a significant deviation from standards. TJC issued a Preliminary Denial of Accreditation due to an Immediate Threat to Health or Safety that exists for patients, staff or for the public within the hospital program.

n.  In April 2025, the Governor ordered the implementation of a 30 day corrective plan. The plan mandates that OSH implement mitigation plans for high-risk patients; develop practices and procedures to identify, report, and act on risks to ensure staff are responding to warning signs; and implement mandatory executive rounding to ensure more executives have eyes on patients and hear from staff regularly.

o.  In May 2025, federal investigators found executive leadership of the Hospital ignored safety warnings and staff failed to properly manage and monitor patients.

p.  Multiple federal investigations detailed systemic safety lapses, understaffing, and management failures, including dangerous unmonitored patients, high rates of violent assault. In June 2025, a federal court in *Oregon Advocacy Center v. Mink* held the State of Oregon in contempt for failure to promptly admit patients from jail.

**Standards of Care**

**I. Oregon Law**

40.    Oregon law sets legal requirements for all hospitals, including psychiatric hospitals. *See* ORS 443.410, OAR 333-525-0000, 309-032-0870, 42 C.F.R. §§ 482.12-482.13, 42 C.F.R. § 482.60.  The rules and regulations set forth minimum staffing levels, treatment plans, provider qualifications and treatment modalities.

41.    An Oregon mental health hospital must be certified through OHA. OHA Behavioral Health Division oversees mental health facilities to ensure compliance with safety and care standards. Both the Hospital and many practitioners within the facility must be licensed through the State.

42.    All standards for mental or psychiatric hospitals are set forth at OAR 333-500-0032, which provides a list of services and standards that must be met in order to maintain certification. OSH must, at a minimum,

    a.    Be devoted primarily to the care of people suffering from mental illness.

    b.    Have adequate numbers of qualified professional and supportive staff to evaluate patients, formulate written, individuated comprehensive treatment plans, provide active treatment measures and engage in discharge planning to include a competent and properly trained clinical director or equivalent:

        i.    Who is qualified to provide leadership required for an intensive treatment program;

        ii.    Who directly monitors and evaluates the quality and appropriateness of services and treatment provided by the medical staff; and

        iii.    Who supervises inpatient psychiatric services.

c.    Adequately train doctors to provide necessary medical and surgical diagnostic and treatment services.

d.    Employ a director of psychiatric nursing who demonstrates competency to participate in interdisciplinary formulation of individual treatment plans; to provide skilled nursing care and therapy; and to direct, monitor and evaluate the nursing care furnished.

e.    Employ adequate numbers of trained registered nurses, licensed practical nurses, and mental health workers to provide nursing care under a patient's active treatment program and to maintain progress notes on each patient.

f.    Employ a director of social services.

g.    Have a therapeutic activities program that is appropriate to the needs and interests of patients and directed toward restoring and maintaining optimal levels of physical and psychosocial functioning.

h.    Maintain medical records in a manner permitting determination of the degree and intensity of the treatment provided to patients. Medical records must stress the psychiatric components of the record, including history of findings and treatment provided for the psychiatric condition of the patient, the patient's legal status, provisional or admitting diagnosis including diagnosis of intercurrent medical diagnosis, the reason for the admission by patient history, social service records, documentation of all therapeutic efforts, and discharge summary.

i.    Have a psychiatrist perform a psychiatric evaluation of each patient within 60 hours of admission that includes a medical history, contains a record of

mental status, notes the onset of illness and the circumstances leading to admission, describes attitudes and behavior, estimates intellectual functioning, memory function and orientation, and includes an inventory of the patient's assets.

j.     Develop a written individual comprehensive treatment plan based on an inventory of the patient's strengths and disabilities.

k.     Ensure progress notes are recorded by the doctor responsible for care, nurses, social workers , and others involved in active treatment modalities. The frequency of the notes is determined by the patient's condition but must be recorded at least weekly for the first two months and once a month thereafter. The medical record must contain recommendations for reviewing the treatment plan.

l.     Have available on-site or through contract, dietary, laboratory, and radiology services.

m.    Have an on-site pharmacy or a drug room.

n.     Have appropriately trained laboratory, radiology, and pharmacy staff on site or on call 24/7.

## II.    The Joint Commission

43.    TJC is an independent non-profit organization that accredits and certifies hospital and healthcare organizations. TJC sets high standards for quality, safety and performance designed to improve patient care. Hospitals are surveyed by TJC every 2-3 years, usually unannounced, using "tracer methodology" to follow patient experiences and evaluate compliance. TJC sets specific annual goals to address emerging patient safety issues. Failure to

adequately comply with TJC standards can result in the loss or suspension of accreditation, which can cause the loss of federal reimbursements.

44.    Mental health hospitals in Oregon are not mandated by law to pass TJC accreditation as participation is voluntary. However, in order to receive federal reimbursements through Medicare and Medicaid, hospitals must ensure compliance with CMS to receive funding. Accreditation signifies that a hospital meets rigorous patient care and safety standards. Hospitals and healthcare facilities accredited by TJC are granted "deemed status" by the federal government, meaning they are considered to have automatically met Medicare and Medicaid conditions of participation without a separate government inspection. Medical facilities receiving Medicare and Medicaid reimbursement are required to meet CMS's conditions of participation. This is accomplished either by passing CMS survey directly, or by earning TJC accreditation, which serves as an accepted substitute.

III.    Centers for Medicare and Medicaid Services Surveys

45.    CMS through their Center for Clinical Standards and Quality conducts surveys of medical facilities to assess compliance with Medicare and Medicaid requirements and any violations of a Medicare provider agreement.

46.    OSH was the subject of a CMS survey and on-site inspection several times.

47.    CMS investigations of OSH in 2023 and 2024 identified systemic failures in patient safety, including failure to ensure adequate monitoring, failure of nursing staff to perform ongoing assessments, and failure to implement and enforce safe seclusion practices. CMS also found that the hospital failed to develop and implement effective policies and staff competencies related to seclusion and restraint.

48.     OSH was again the subject of a CMS survey and on-site inspection on or about April 25, 2025. The 2025 survey and audit found an "Immediate Jeopardy" ("IJ") situation on March 31, 2025 (hereinafter referred to as the "CMS Report").

49.     CMS issued a notice to terminate the Medicare provider agreement with OSH that would have removed all Medicare and Medicaid reimbursement funding. CMS sent a letter of deficiency on May 6, 2025, and May 22, 2025, advising of the pending termination and the basis for the deficiencies. A list of all the deficiencies was contained in Form CMS 2567 Statement of Deficiencies and Plan of Correction sent to OSH at least twice. The list of deficiencies sent by CMS to OSH found two IJ situations existed.

50.     The CMS Report itemized substantiated numerous 'condition level" deficiencies:

a.      Failure to ensure the Hospital met standards for licensure in the State of Oregon as OSH failed to have on site medical services necessary for licensure including radiology services and staff.

b.      The governing body of the Hospital was not organized or effective and failed to ensure that the Hospital operated in accordance with current and complete governing body bylaws, medical staff bylaws, and rules and regulations and failed to ensure patients received safe and appropriate care, which contributed to the death of Mr. Hass and "created the likelihood of harm to other patients."

c.      "[T]he cumulative effect of these systemic failures resulted in this Condition level deficiency" that represented a limited capacity on the part of the Hospital to provide safe and adequate care.

d.      Failing to address reports by staff of serious patient harm, including Mr. Hass, and concerns raised by treatment providers to Mr. Hass and other

patients. The CMS Report found that executive leadership coached staff on what to say and not to say to CMS surveyors. Staff brought serious patient concerns and safety issues to the attention of executive staff who ignored the complaints, including those involving Mr. Hass. The CMS Report noted specifically that the "OSHS/CMO"—Defendant Walker—ignored complaints and refused to correct actions involving two patients.

e.     The "overuse of seclusion and restraints" specifically on Mr. Hass. In one notable incident, nurses reported a belief that a patient should be released from isolation but they were met with anger and retribution by a physician who insisted the nurses keep the patient in seclusion, all in violation of hospital policy.

f.     The Hospital department, programs, and units are fragmented, broken, or non-existent.

g.     Medical clinic communication with the patient units was lacking. Clinic scheduling of patient appointments and visits was disorganized and not efficient.

h.     OSH documentation and diagnostic testing results from patient specialty visits and consultations to providers in the community were not communicated to inpatient units nor incorporated in the patient's medical records.

i.     Psychology and social work needs of patients were not provided timely or often not provided at all, behavioral plans were not developed and updated, and clinical notes were not written and required.

j.      There were no standards for medical clinical documentation and corrective action plans developed in response to the previous CMS investigation and the objectives set out previously were not accomplished.

k.      Medical staff who provided direct care of patients for whom sentinel events occurred were also involved in the Hospital's investigations of those same events, thus impacting any attempt at impartial and objective investigation and fact finding regarding deficient practices and corrective actions.

l.      Numerous existing Hospital policies were outdated and unclear.

m.      OSH failed to fully develop and implement procedures and policies that ensured patients received care in safe settings, including timely and appropriate medical emergency response. The Hospital failed to adequately train staff for emergency events and failed to provide adequate equipment for use in emergency responses. The Hospital's failures contributed to harm and death of one patient—Mr. Hass—and created the likelihood of harm to others. The CMS Report outlined very detailed descriptions of the numerous failures by staff, including the treating psychiatrist in the response to Mr. Hass's emergency on March 18, 2025.

51.      CMS investigations of the Oregon State Hospital in 2023 and 2024 identified systemic failures in patient safety, including failure to ensure adequate monitoring, failure of nursing staff to perform ongoing assessments, and failure to implement and enforce safe seclusion practices. CMS also found that the hospital failed to develop and implement effective policies and staff competencies related to seclusion and restraint. The failures noted by CMS in

2023 and 2024 were also found in the 2025 audit, inferring little corrective action was taken after 2023.

52.     These findings were identified as repeat deficiencies across multiple survey cycles, demonstrating that the Hospital had ongoing notice of serious safety risks and failed to correct them.

**IV.     American Psychiatric Association Guidelines**

53.     The American Psychiatric Association ("APA") is a non-profit professional organization. APA regularly publishes evidence-based practice guidelines for the treatment and diagnosis of mental illness. APA guidelines focus on a set of discrete clinical questions of relevance to an overarching subject area. APA uses a systematic review of evidence addressing the clinical questions and relies on a detailed assessment of individual studies. APA guidelines are viewed as the basic standard of care for practitioners who treat and diagnose individuals with mental health concerns.

54.     APA publishes the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"). The DSM-5 serves as the bedrock for psychiatric diagnosis worldwide. APA guidelines are utilized in research and clinical practice to standardize care.

55.     APA has published numerous guidelines on a variety of subjects including without limitation: Schizophrenia, Use of Antipsychotics and Psychiatric Evaluation of Adults ("APA Guidelines"). The APA Guidelines provide instruction and guidance on the use of restraint and isolation for mentally ill patients, creating treatment plans for patients, charting, and numerous other aspects of caring for mentally ill patients in each discrete subject area.

56.     The APA Guidelines are the most well-known and widely accepted guidelines for psychiatric care, with the DSM-5 considered to be the world's "gold standard" for the diagnosis

of psychiatric illnesses. The APA Guidelines are published as a source authority in the National Library of Medicine through the National Institutes of Health.

57.     The American Centers for Disease Control and Prevention ("CDC") recognizes and utilizes the APA Guidelines, specifically the DSM-5, as standard practice. The CDC and the APA have partnered on many joint efforts to provide increased public education and accurate diagnostic techniques.

**Kenneth Hass**



## I.   Early Life Trauma

58.     Mr. Hass was born August 2, 1999, at Sacred Heart Medical Center ("Sacred Heart") in Springfield, Oregon. He was born premature at 30 weeks, 5 days gestation and faced

significant medical challenges in his first few weeks of life. By August 28, 1999, Mr. Hass was discharged from Sacred Heart in good health.

59.    At four months old, Mr. Hass suffered several episodes where he would gag, choke, and turn blue. He was admitted to Sacred Heart and diagnosed with apnea, bronchospasm, and a viral respiratory infection.

60.    Mr. Hass was diagnosed with mild cerebral palsy with spastic diplegia. Mr. Hass underwent surgical interventions, beginning at the age of seven, to enhance his mobility and daily function.

61.    Mr. Hass was in casts for two summers during his childhood.

62.    Cerebral palsy with spastic diplegia increased Mr. Hass's risk of falling.

63.    Throughout his childhood and until his admission to OSH, Mr. Hass's cerebral palsy was well managed.

64.    Mr. Hass's parents separated when he was three years old and he suffered from physical abuse and neglect during the early years of his life. He was subject to physical beatings, sexual trauma, and often significant neglect. The vast majority of this abuse and neglect came from family members and trusted adults.

65.    Mr. Hass began huffing paint at age seven, was exposed to methamphetamines around the same age, and was drinking alcohol by age ten.

66.    At age eleven, Mr. Hass's mother moved to Texas. He stayed in Oregon with his father and sister.

67.    By age twelve, Mr. Hass was consistently using alcohol and marijuana.

68.    Mr. Hass struggled at school. By middle school, he was placed on an Individualized Education Program for behavioral and emotional disturbance.

69.    Mr. Hass repeatedly tested as having ordinary intelligence.

## II.    Juvenile Corrections

70.    While in middle school, disruptive behavior such as vandalism and graffiti landed Mr. Hass in the Oregon's juvenile corrections system. He was shuttled between Serbu, MacLaren, and North Coast Youth Correctional Facilities before spending nine months at the Hillcrest Youth Correctional Facility. From there, he was referred to the St. Mary's Home for Boys' Residential Treatment Program ("St. Mary's").

71.    When admitted to St. Mary's at age fourteen, Mr. Hass suffered from anger, impulsivity, and anxiety. He acknowledged having issues with rapid aggression and anger management. At this time, Mr. Hass did not suffer from any thought disorders.

72.    At St. Mary's, Mr. Hass made great strides under a "Token Economy" rewards-based behavioral system. He would receive tokens for good behavior and lose tokens for negative behaviors. Performance was scored weekly on a Program Compliance Index (PCI) with bands: Outstanding (90–100), Succeeding (30–89), Marginal (20–29), Troubled (10–19), and Critical (0–9). Performing well under the token system would lead to increased privileges, while failure would result in loss of privileges at St. Mary's.

73.    Mr. Hass initially struggled at St. Mary's but, about six months after he was admitted, expressed a desire to gain his privileges back at the facility. He began to make dramatic improvements with the token economy system.

74.    In the following months, Mr. Hass achieved "Outstanding" scores in the token economy system for fifteen consecutive weeks.

75.    By his discharge date, Mr. Hass had been free of aggressive behaviors for seven months and was anxious to leave and "live like a normal teenager." He returned to the Eugene area to live with a paternal aunt and enrolled in public school.

76.     Mr. Hass spent almost a year in Eugene before moving to Texas to live with his mother and finish high school.

77.     Mr. Hass was able to graduate from high school in Texas, but had difficulty living "like a normal teenager." He was arrested several times and charged in Texas' juvenile justice system. Soon after his eighteenth birthday, Mr. Hass returned to Oregon.

## III.     Adulthood and Mental Health Struggles

78.     Upon Mr. Hass's return to Oregon, he intermittently lived with family but had no fixed address. During this time, Mr. Hass continued to struggle with drug and alcohol use.

79.     In October 2019, Mr. Hass was hitchhiking to his grandmother's house while carrying a machete. The two women he stopped called the police, and Mr. Hass was arrested. Upon his arrest Mr. Hass was confused and thought he had done nothing wrong.

80.     As a result of this incident, Mr. Hass was charged with and pled guilty to Unlawful Use of a Weapon – a Class C Felony. He was placed on 24 months' probation.

81.     Mr. Hass initially followed the terms of his probation. When the pandemic struck, Mr. Hass's mental health worsened. He was intermittently jailed throughout 2020 and 2021 due to his inability to report to his parole officer.

82.     Between 2019 and 2021, Mr. Hass had difficulty finding a stable living situation and continued to use methamphetamine. Mr. Hass's parole officer repeatedly noted that "Hass is struggling with substance addiction and mental health issues" and that "Hass is really struggling with his substance addiction and mental health." The parole officer later noted that "I would like to see Hass engage in mental health treatment and eventually drug treatment as he is also addicted to Methamphetamine."

83.     On September 12, 2021, Mr. Hass lived with his father in Cresswell. He suffered an acute mental health crisis resulting in his father calling the police, who referred Mr. Hass to

Sacred Heart's emergency department for a mental health evaluation. Doctors at Sacred Heart determined that he did not meet the criteria for inpatient psychiatric care. They discharged him with a follow up appointment at G Street Integrated Health for later that week.

84.    Mr. Hass did not make his follow-up appointment.

85.    On September 19, 2021, Mr. Hass voluntarily sought help at Sacred Heart. He had not used methamphetamine for over a week, but was suffering from paranoia, hearing voices, and had not slept in over 24 hours. Doctors noted Mr. Hass suffered from delusions and some degree of psychosis. He was administered Zyprexa and allowed to sleep in the emergency department. Doctors noted that "chronic methamphetamine use is certainly playing a role" in his mental health issues. At his request, he was discharged with instructions to seek outpatient mental health treatment.

86.    On September 22, 2021, Mr. Hass again sought help from Sacred Heart for paranoia and active hallucinations. Doctors there noted a "concern [for] amphetamine intoxication, versus some more organic psychosis." Mr. Hass was admitted to Sacred Heart's inpatient behavioral health for further care.

87.    By September 28, 2021, Mr. Hass was feeling significantly better. He reported that "the voices are gone" and that he felt "fine."

88.    On September 30, 2021, he was released to his brother-in-law from inpatient psychiatric care. Mr. Hass was instructed to continue treatment with Lane County Behavioral Health.

89.    After his discharge, Mr. Hass was soon arrested and jailed for failure to comply with the terms of his probation. While in jail, his mental health worsened, and he was transferred from jail to Sacred Heart. At Sacred Heart, Mr. Hass asked to be admitted to the Behavioral Health Unit. Mr. Hass underwent a mental health evaluation but Sacred Heart would not admit

him for behavioral health. He was discharged on October 31, 2021, with a bus pass, food, and a warm coat.

90.     On November 4, 2021, Mr. Hass returned to Sacred Heart. He reported needing more medication because he "still hears the voices." He was provided medication and discharged that night.

## IV.     Arrest and Commitment Proceedings

91.     On November 5, 2021, Mr. Hass sought care at the Buckley Detoxification Center. After several hours, staff attempted to discharge Mr. Hass, but he refused to leave. Staff at the center called the Eugene Police Department.

92.     Upon arrival, officers observed Mr. Hass talking to himself and drinking water out of the toilet. Mr. Hass told the officers his family was being held hostage and he needed to negotiate their safe release.

93.     When Mr. Hass refused the officers' requests to leave, two officers handcuffed him. While he was putting his shoes on, Mr. Hass kicked one officer in the thigh. Mr. Hass was immediately pushed forward against the wall and placed under arrest. He apologized and agreed to walk out to the officers' patrol vehicle. While walking out, he attempted to kick another officer.

94.     Both officers pushed Mr. Hass to the ground and applied a flexible leg restraint. Mr. Hass was then transported to the Lane County Jail.

95.     As a result of the November 5, 2021, incident, Mr. Hass was charged with two counts of Assaulting a Public Safety Officer and one count of Criminal Trespass in the Second Degree. He was appointed a public defender.

96.     Mr. Hass's attorney visited him several times at the Lane County Jail. She developed concerns regarding his fitness to proceed in the criminal case, concluding an

evaluation should be performed to determine Mr. Hass's ability to participate in his criminal defense.

97.    On December 3, 2021, Mr. Hass's attorney filed a motion to determine his fitness to proceed pursuant to ORS 161.370. For the next two and a half months, Mr. Hass languished in the Lane County Jail while awaiting an evaluation by OSH.

### Legal Standards for Admission to the Oregon State Hospital

98.    Admission to OSH can occur in four general ways:

    a.    Voluntary self-commitment;

    b.    Involuntary civil commitment under ORS 426.005–426.390;

    c.    Sentenced to the hospital after a legal determination of guilty but insane under ORS 161.295; or

    d.    Admission to restore legal competence to be prosecuted ("Aid and Assist") under ORS 161.370.

### I.    Aid and Assist Evaluations Under ORS 161.370

99.    Individuals accused of a crime may not be able to participate in their trial due to mental illness. A court may order them sent to a mental health facility to be evaluated and treated to be able to assist in their own defense. Once an Aid and Assist order is entered, the patient must be transferred to the mental health facility within seven days. *See Bowman v. Matteucci*, No. 3:21-cv-01637-HZ, 2021 U.S. Dist. LEXIS 220094 (D. Or. Nov. 15, 2021).

100.    An Aid and Assist order directs an individual to an appropriate mental health facility, usually OSH, for evaluation. The primary treatment goals under this order are stabilization and achieving a level of capacity so they can participate in their own defense, or, "restoration."

101.    An Aid and Assist evaluation is conducted by a team of certified examiners comprised of a psychologist and a psychiatrist. The examiners evaluate patients to determine whether they are able to aid and assist in their defense and ready to return to court. The evaluations are due within 90 days of admission, 180 days of admission, and then every 180 days after that.

102.    The evaluation may determine if the patient is able and competent to stand trial. If they are, the patient is sent back to the originating county jail to await further disposition of the criminal case. If the patient is never able or unlikely to regain capacity in the foreseeable future the judge may decide to discontinue the order and dismiss the charges, order the patient released, or initiate civil commitment proceedings.

103.    The Hospital may keep patients under an Aid and Assist order for up to three years or the period of time equal to the maximum sentence the court could have imposed if the defendant had been convicted, whichever is shorter.

## II.    Involuntary Civil Commitment Under ORS 426.005–426.390

104.    Anytime an individual is forcibly committed to a mental health facility, Oregon law is implicated. *See* ORS 426.005–426.390. Individuals committed to the care of the State of Oregon may only be held for 180 days and must have a diagnosed mental disorder and be dangerous to themselves or others, or unable to provide for their own basic needs, due to that mental disorder. The civil commitment process is initiated by two persons, usually law enforcement officers or a local health officer. The proper written notice must meet the requirements of ORS 426.070.

105.    The civil commitment process gives the patient or "allegedly mentally ill person" a range of due process rights, including a hearing within five days, right to counsel, ability to subpoena witnesses, and a determination based on a finding there is probable cause to believe the

individual has a mental illness and meets the criteria of commitment. Commitments are ordered by a judge of the circuit court.

106.    OHA rules governing involuntary civil commitment mimic the statute and are referenced at OAR 309-033-0200-0900. If the individual has a mental disorder making them a danger to themselves or others or makes them unable to provide for their basic personal needs, leading to a risk of serious physical harm in the near future, they may be subject to a civil commitment proceeding. The investigation by OHA is conducted by a pre-commitment investigator with the final determination made by a judge on the record. The examiners and investigators must be certified by the State of Oregon.

**Mr. Hass Entered the Oregon State Hospital Following an "Aid and Assist" Evaluation**

107.    Mr. Hass was seen by Dr. Shawgi Silver at OSH on February 23, 2022. Dr. Silver noted Mr. Hass presented with behaviors suggestive of delusions, hallucinations, and disorganized thoughts. Based on these findings, Dr. Silver found Mr. Hass was not fit to assist in his criminal defense.

108.    On March 4, 2022, the Lane County Circuit Court entered an order finding Mr. Hass unable to assist in his own criminal defense. The court further ordered that Mr. Hass be committed to the custody of OSH to restore his ability to assist in his criminal defense.

109.    Mr. Hass was transferred to OSH on March 30, 2022.

110.    Lane County and Defendant State of Oregon unlawfully failed to transfer Mr. Hass to OSH within seven days of the Court's Aid and Assist order.

111.    During the nearly five months between his arrest and his admission to OSH, Mr. Hass's mental health deteriorated further. He had spent much of that time in solitary confinement. While in solitary confinement, he was left naked and allowed to drink from the toilet, urinate in his room, self-harm, and play with his own feces.

Page 27 of 114 – COMPLAINT

112.    Mr. Hass received an initial evaluation at OSH on April 6, 2022. Hospital staff had access to his complete jail medical records, court documents, and a psychiatric assessment and they were able to attempt an interview. Although Mr. Hass refused to answer questions, clinicians noted that he suffered from active psychosis "either from substance use or a history of mental illness."

113.    Mr. Hass's admission diagnoses included "unspecified schizophrenia spectrum and other psychotic disorder," "stimulant use disorder, severe," and "cannabis use disorder, moderate." His principal diagnosis—"unspecified schizophrenia spectrum and other psychotic disorder"—is a diagnosis of exclusion. It does not describe any specific psychiatric illness with established features, course, or treatment.

114.    During the almost three years leading up to Mr. Hass's death at OSH, his principal diagnosis was always "unspecified." During the course of his hospitalization, Hospital doctors could never identify a precise diagnosis. Without a precise diagnosis, Hospital doctors could not and did not form an appropriate functional treatment plan.

115.    Hospital doctors never formed any scientific approach to Mr. Hass's diagnosis and treatment. Possible diagnoses were an ever-changing list that at times included catatonia, delirium, and mania.

116.    Throughout the course of his commitment, Mr. Hass alternated between radically different behaviors over short periods of time. He could range from calm and lucid to withdrawn to aggressive in a matter of hours.

117.    For example, on April 5, 2022 (shortly after his admission), Mr. Hass was alert, verbally responsive, eating his meals, and sleeping normally. He expressed empathy and concern for a patient who hit him on the back. The next day, he was in seclusion, engaging in self-harm behaviors, urinating in the room, playing with his feces, and removing his clothing.

Page 28 of 114 – COMPLAINT

118.    On April 7, 2022, Mr. Hass was first placed on "1:1 supervision" for behavioral concerns. "1:1 supervision" is a safety intervention where one staff member provides continuous, dedicated monitoring of one patient. It is used to ensure patient safety or prevent patient aggression.

119.    Mr. Hass was on some form of 1:1 supervision for the majority of his time at OSH. He was typically under 1:1 supervision ostensibly for risk of aggression, fall risk, and/or locked seclusion.

120.    Very early on in his stay at OSH, Mr. Hass demonstrated a common pattern of disrobing before becoming aggressive.

121.    After his initial evaluation at OSH, Mr. Hass was placed in "Lighthouse 2"—a ward for admission and stabilization—on April 14, 2022.

122.    Patients are typically grouped in wards of approximately 30 based on their treatment status and severity. Each ward has a common area where the patients can share common space. In addition, each patient has a dorm-style room with a private bathroom that opens into a common area, sometimes referred to as a "milieu."

123.    Mr. Hass consistently refused oral medication during his time at OSH. For this reason, OSH doctors requested an "independent review" by Scott Reichlin, MD, an employee there, to obtain "involuntary consent" to prescribe medication to Mr. Hass. After two visits where Dr. Reichlin largely failed to interact with Mr. Hass, on April 17, 2022, Dr. Reichlin provided involuntary consent  (i.e., forced medication) to a myriad of medications on Mr. Hass' behalf: olanzapine, long-acting injectable Risperdal (risperidone) Consta, Depakote (valproate), sertraline, lorazepam, and benztropine.

124.    During the course of his treatment, Mr. Hass's medications were repeatedly altered without attempting to obtain Mr. Hass's voluntary or involuntary consent.

125.    For the first few months at OSH, Mr. Hass's condition improved significantly. He began to interact with staff and other patients, engaging in games and discussion. However, he refused to shower until staff forced him to do so. During this time, OSH doctors continued to change his medication, but made no attempt to formally examine Mr. Hass or refine his diagnosis aside from the court-mandated evaluations of his competency.

126.    The first progress report on Mr. Hass's competency after admission was performed by Andrew Dorf, PsyD, on June 3, 2022. He performed well for the initial portion of the interview. After ten minutes, Mr. Hass stated "I'm good on questions," flashed a peace sign, and left the interview.

127.    In his written report on June 8, 2022, Dr. Dorf opined that Mr. Hass remained unable to assist in his defense but that restoration of his capacity was likely within two to nine months. This report was delivered to the Lane County Circuit Court on June 8, 2022.

128.    For the next several months, OSH doctors struggled to define Mr. Hass's diagnosis and continued to alter his medication. His symptoms generally worsened. Mr. Hass became more reclusive, began to experience falls, and was found drinking toilet water.

129.    Many of Mr. Hass's symptoms were worsened by neuroleptic malignant syndrome ("NMS"). NMS is a rare life-threatening reaction to antipsychotic medication. Classic symptoms are hyperthermia (high fever), muscle rigidity, altered mental status (e.g., confusion, agitation, delirium, or reduced consciousness), autonomic instability (e.g., fluctuating blood pressure, rapid, heart rate, sweating, and drooling). Other common symptoms include tremor, difficulty, swallowing, incontinence, and pallor. NMS is a medical emergency that can lead to kidney failure, cardiac arrhythmias, or death, if not treated properly.

**Oregon State Hospital Began Relying on Seclusion Rather Than Treatment for Mr. Hass**

130.     By August 2022, OSH staff were well-acquainted with Mr. Hass's fall risk. They noted that he had suffered recent falls and that his fall risk was "moderate."

131.     On August 2, 2022, Mr. Hass suffered a fall in his room. He was placed in locked seclusion for "Safety."

132.     An August 8, 2022 fall risk assessment found that 1-2 medications were contributing to Mr. Hass's fall risk.

133.     Further, by August 2022, OSH staff were well acquainted with Mr. Hass's precursors to aggression. On August 11, staff noted that "[c]oming out of his room naked is a precursor of being assaultive." Mr. Hass reported that he would undress and become aggressive because "it is what God wants."

134.     On August 21, 2022, Joseph Chien, D.O., performed a progress report on Mr. Hass's competency. Mr. Hass refused to participate in the evaluation. On September 15, 2022, Dr. Chien authored and delivered a report to Lane County Circuit Court. He opined that Mr. Hass was still unable to assist in his defense, but that there was a substantial possibility that his capacity would be restored in six to nine months.

135.     Mr. Hass's condition worsened significantly. He was placed on 1:1 medical observation for much of August due to repeated and worsening falls. His medications were changed and changed again, including discontinuing all medication due to NMS.

136.     On August 27, 2022, Mr. Hass refused his prescribed medications. When staff attempted to forcibly inject him with medication, Mr. Hass refused and approached staff in a run. Mr. Hass was placed in four-point restraints, a spit hood, and taken to a seclusion room. He was kept in locked seclusion for over a week.

137. "Locked seclusion" is the term used by mental health providers to describe the practice of leaving a patient alone in a locked room. It is almost identical to the use of "solitary confinement" in prisons, except that locked seclusion is used on patients at a hospital.

138. "Mechanical restraints" are any physical device used to restrict a patient's ability to move. At OSH, "mechanical restraints" almost always refer to "four-point restraints." These consist of tying each of a patient's four limbs to a bed so they cannot move at all.

139. Locked seclusion and mechanical restraints have no therapeutic value. They can cause suffering, emotional and physical harm, and even death. For these reasons, locked seclusion and manual restraints are heavily regulated and only used in extreme circumstances.

140. Under federal law, "restraint and seclusion may only be imposed to ensure the immediate physical safety of the patient, a staff member, or others and must be discontinued at the earliest possible time." Simultaneous use of restraint and seclusion is only permitted if the patient is continually monitored.

141. Under Oregon law, hospitals may not use seclusion or restraints "except in an emergency" and, even then, subject to strict limitations. The maximum time limit for each restraint/seclusion order is four hours. During this time, the patient must be checked every fifteen minutes.

142. Restraint and seclusion orders can be extended up to a maximum of twenty-four hours. After twenty-four hours, an examination and second opinion must occur by a second physician.

143. In Mr. Hass's situation, locked seclusion and manual restraint were often used as punishment and in lieu of actual treatment.

144. On September 18, 2022, Defendant Peykanu first became involved in Mr. Hass's care. The sole "treatment" Defendant Peykanu provided on that date consisted of placing Mr. Hass in locked seclusion for another four hours.

145. The first 97 times Defendant Peykanu saw Mr. Hass, his sole "treatment" would consist of locked seclusion.

146. Mr. Hass's course of treatment in August 2022 was a harbinger for how he—and all patients at OSH—would be treated over the next several years. From the fall of 2022 until his death in March 2025, Mr. Hass and many other patients at OSH were subject to prolonged and repeated use of seclusion, often without active treatment or clear, behaviorally defined criteria for release.

147. The seclusion rooms in which Mr. Hass spent most of the rest of his life consisted of concrete walls, a concrete floor, and a bare mattress with a small attached bathroom that was sometimes accessible. More often, the bathroom was locked and a bedpan was placed in the seclusion room. A small anteroom lay past the locked door of Mr. Hass's seclusion room.

148. To one side of the anteroom there was an observation room. OSH staff monitored Mr. Hass through this observation room through several cameras, which displayed him from multiple angles on multiple monitors, and two one-way mirrors (one looking into the seclusion room and another into the bathroom). Whenever Mr. Hass was placed in locked seclusion, OSH policy mandated that he be on constant 1:1 observation by an employee.

149. Mr. Hass spent the majority of September, October, and November 2022 in locked seclusion.

**<u>Mr. Hass Was Found Able to "Aid and Assist" and Was Subject to Further Proceedings Regarding His Mental Health Fitness in Lane County Circuit Court</u>**

150. It was not until December 15, 2022, that the first formal examination for any specific disorder was conducted. Defendant Bell evaluated Mr. Hass using the Bush-Francis Scale, an established instrument for assessing catatonia. The score indicated "likely catatonia." After a brief review of some relevant literature, Defendant Bell concluded that an adequate treatment trial for catatonia had not occurred.

151. Defendant Bell noted that electroconvulsive therapy ("ECT") was the "gold standard of treatment" for catatonia that that he "could, without a shred of doubt" obtain a court order mandating treatment.

152. Instead of moving forward with ECT, Defendant Bell planned to hold all antipsychotic drugs for four days. This was not done, and Mr. Hass returned to his normal rotation of antipsychotic medications. No one attempted to obtain court approval for ECT.

153. Over late December and January, Mr. Hass appeared "happier and more relaxed, playing games with staff [and] dancing to music playing in the hallway. The length of seclusion and restraint [] lessened significantly and Kenneth [was] very engaged with peers and staff."

154. On January 20, 2023, OSH doctors updated Mr. Hass's treatment plan. They noted that Mr. Hass continued to have a moderate fall risk and that he should be monitored for increased falls. However, his treatment plan was updated to instruct staff "DO NOT catch Kenneth if he falls."

155. The instruction to "NOT catch Kenneth if he falls" was part of Mr. Hass's treatment plan for the rest of his time at OSH.

156. OSH did not conduct a follow-up Aid and Assist evaluation to extend Mr. Hass's stay for another 180 days.

157.    Mr. Hass was discharged from OSH on February 23, 2023, at the end of their jurisdiction. Leading up to his discharge, OSH strongly recommended that Lane County pursue a civil commitment for Mr. Hass. Lane County would not commit to a civil commitment in advance but acknowledged that it might pursue this option upon Mr. Hass's return to Lane County Jail.

158.    On February 23, 2023, Lane County Circuit Court held a hearing on Mr. Hass's fitness to proceed in his criminal defense.

159.    The Lane County Circuit Court ordered a report and risk assessment to be performed on Mr. Hass, which occurred on February 27, 2023.

160.    On March 7, 2023, Mr. Hass's defense attorney moved to dismiss the criminal charges against him.

161.    On March 10, 2023, Judge Morgan of Lane County Circuit Court entered an order dismissing Mr. Hass's criminal case in its entirety. Twenty seconds later, Judge Morgan signed a "notice of mental illness," initiating civil commitment proceedings pursuant to ORS 426.130.

162.    Pursuant to Lane County Circuit Court's Notice of Mental Illness, a Warrant of Detention was signed transferring Mr. Hass to Sacred Heart's emergency department pending a decision in his civil commitment proceedings. On March 10, 2023, Mr. Hass was released from Lane County Jail to Sacred Heart in handcuffs and in a wheelchair.

163.    When staff at Sacred Heart attempted to remove the handcuffs, Mr. Hass assaulted staff and attempted to flee. He was immediately placed in seclusion and a psychiatric hold. While Mr. Hass was at Sacred Heart, Lane County Circuit Court scheduled Mr. Hass's civil commitment hearing for March 17, 2023.

164.    Mr. Hass's civil commitment hearing was held on March 17, 2023. Lane County Circuit Court adjudged him to have a mental disorder and to be a danger to others. Based on this finding, Mr. Hass was civilly committed to OSH for a period of 180 days.

**Mr. Hass Was Involuntarily Civilly Committed to Oregon State Hospital**

165.    On March 20, 2023, Mr. Hass was readmitted to OSH, this time on an involuntary civil commitment. His principal diagnosis, as ever, was "unspecified schizophrenia spectrum and other psychotic disorder."

166.    The day after his admission, Mr. Hass "got naked and ran into the milieu." He began kicking and spitting at OSH staff, and was placed in mechanical restraints and locked seclusion for four hours. Mechanical restraints were removed after four hours, but Mr. Hass was kept in locked seclusion for over a week.

167.    After this extended stay in locked seclusion, Mr. Hass began to prefer sleeping in a seclusion room even when not locked in the room by OSH staff.

168.    On April 5, 2023, OSH staff were able to perform a full medical admission examination on Mr. Hass. In his treatment plan, staff noted that he needed to be monitored for fall risks.

169.    In the spring and summer of 2023, Mr. Hass repeated a long-familiar pattern: he would begin to disrobe, which was known to staff to be a precursor to aggression. Any time staff saw Mr. Hass begin to disrobe, they would place him in restraints and keep him in seclusion for days. Oftentimes, Mr. Hass would be placed in restraints and kept in seclusion for days without displaying any aggression.

170.    By July 2023, Mr. Hass had spent a large portion of his involuntary civil commitment in seclusion. Much of this time was spent in four-point restraints, often at the same

time he was in locked seclusion. For the first time, an OSH doctor considered calling Mr. Hass's sister, Ms. Hass.

171.    On July 19, 2023, a Certificate for Continued Commitment for Mental Illness was served on Mr. Hass at OSH. A court made a preliminary finding that Mr. Hass suffered from a mental disease or defect which affected his ability to care for himself or made him a danger had already been made. Mr. Hass was legally unable to provide consent to any proceeding. Mr. Hass did not formally object.

172.    A detailed history was obtained from Ms. Hass on July 28, 2023, but no attempt was made to follow up with her or the information she provided for months.

173.    Because Mr. Hass did not formally object, Lane County extended his civil commitment for an additional 180 days beginning September 12, 2023.

174.    In September 2023, Mr. Hass was placed under the care of Defendant Bowers. Under his treatment, Mr. Hass continued to decompensate in OSH. He was prescribed a never-ending rotation of medications, but his condition steadily worsened. He began to develop pressure sores, skin infections, diaper rash, and urinary tract infections due to his lengthy periods of locked seclusion, time in four-point restraints, and exposure to urine and feces.

175.    By the fall of 2023, OSH staff created the Kenneth Hass Safety/Risk Mitigation Plan (the "Plan"). The Plan, particular to Mr. Hass, was located in the nursing office of his ward. The Plan was not designed to treat Mr. Hass's mental illness, but to address staff safety and reduce the risk of staff injury. It is unknown who wrote the Plan.

176.    The very first rule of the Plan encouraged staff to initiate or continue locked seclusion if Mr. Hass demonstrated any of the following behaviors:

      a.     Being naked;

      b.     Fidgeting with clothing;

c.      Not answering questions;

d.      Answering hostilely;

e.      Not eating;

f.      Not drinking;

g.      Not taking medications; or

h.      Staring blankly.

177.    None of these behaviors presented a likelihood of injury, and only the first could be considered a precursor of violence.

178.    The second rule of the Plan instructed OSH staff that they did not have to release Mr. Hass from locked seclusion "even if he is naked and sleeping soundly."

179.    The third rule of the Plan instructed OSH staff to continue locked seclusion unless all of the following conditions were met:

a.      Mr. Hass was fully clothed;

b.      Mr. Hass was "[m]edication compliant;"

c.      Mr. Hass responded to staff assessments "appropriately;" and

d.      Mr. Hass verbally agreed to safety expectations.

180.    The final rule of the Plan prohibited OSH staff from entering Mr. Hass's room unless two or more OSH staff were available to enter the room together.

181.    While the Plan would change over time, this final rule would receive such emphasis that OSH medical providers would refuse to enter his room alone even during a life-threatening medical emergency.

182.    OSH sought further continuation of Mr. Hass's civil commitment beginning in January 2024. When Mr. Hass was informed of this process, he reportedly stated that "he does

not want to leave the hospital and does not want a hearing." However, he refused to sign the "No Protest" form despite several attempts by OSH staff.

183. On March 9, 2024, Lane County approved another 180 days of civil commitment. By this time, Mr. Hass was experiencing one of his "worst cycles." He was hesitant to meet with treatment providers and was receiving essentially no psychiatric treatment except for forced medication. From March 5-8, 2024, Mr. Hass spent roughly seventy-two hours in four-point restraints and locked seclusion. He continued to be heavily restrained and secluded for the following months.

184. Defendant Bowers requested a consultation with another psychiatrist at OSH. That psychiatrist noted that almost no attempt had been made to investigate the source of Mr. Hass's delusions, no referral to spiritual services had been made, and there was no Short Term-Assessment of Risk and Treatability in his file.

185. Defendant Bowers did not follow up on any of these noted omissions. Mr. Hass spent most of the following month in locked seclusion, four-point restraints, or both.

186. In seclusion, Mr. Hass began to exhibit a familiar pattern of behaviors: drinking toilet water and falling.

187. OSH staff noted that Mr. Hass was drinking toilet water in seclusion on March 21, March 31, April 14, April 15, and April 16, 2024.

188. On April 6, 2024, Mr. Hass began to repeatedly fall while in his locked seclusion room.

189. On April 7, 2024, staff noted that Mr. Hass was throwing up and experiencing weakness. His vomit was the color and consistency of coffee grounds. He was taken to Salem Hospital's emergency department for evaluation. Mr. Hass was diagnosed with esophagitis, received treatment, and discharged.

190.    Upon discharge to OSH that afternoon, Mr. Hass was immediately returned to locked seclusion. In the days following his return, he experienced repeated falls.

191.    A pharmacist at OSH reviewed Mr. Hass's chart notes and determined that several of his medications could contribute to an increased fall risk.

192.    Throughout April and May of 2024, Mr. Hass continued to experience falls, psychiatric issues, and medical issues while in locked seclusion. He was placed on 1:1 supervision. His medical issues necessitated repeated visits to the emergency department.

193.    By May 6, 2024, Mr. Hass had developed a urinary tract infection and blood clots due to prolonged seclusion and restraint. The urinary tract infection spread to his bloodstream, causing sepsis and a fever of 103.2 degrees. Mr. Hass was referred yet again to the Salem Hospital's emergency department. This was his fifth visit to the emergency department in four weeks.

194.    Mr. Hass was treated and returned to OSH on May 10, 2024, following four days of hospitalization at Salem Hospital. Upon return, Mr. Hass showed marked psychiatric improvement. He was off all psychiatric medications and was not placed in seclusion.

### Oregon State Hospital Began to Recognize Issues with Prolonged Seclusion

195.    Beginning in April 2024, Mr. Hass was referred for consultation and a psychiatric assessment with Jennifer Snyder, Ph.D., another psychologist and intern at OSH . Dr. Snyder reviewed and assessed Mr. Hass from April 29 through June 21, 2024, and drafted a "Functional Assessment of Behavior."

196.    Dr. Snyder noted a common pattern of behaviors regarding Mr. Hass's aggression.

197.    First, Dr. Snyder noted that being offered medications was a trigger for aggression. She opined that Mr. Hass consistently refused to take his medication orally, and

Page 40 of 114 – COMPLAINT

would be forcibly injected with mediations. He would become dysregulated when OSH staff injected him with medication, especially when several medications were administered at once.

198. This meant that Mr. Hass associated being approached by OSH nursing staff with being forcibly administered medication, making him more volatile and reactive when OSH staff approached him generally.

199. Second, Dr. Snyder noted that Mr. Hass had a desire to "protect" women, and that he has "typically became apologetic when he learns he has [accidentally or inadvertently] caused harm to women."

200. Generally, Dr. Snyder spent a considerable amount of time documenting and attempting to explain the prolonged periods Mr. Hass had spent in seclusion—at the time of her report, up to almost six consecutive days.

201. Dr. Snyder provided four pages of detailed recommendations for the treatment of Mr. Hass to his treating provider, Defendant Peykanu. These recommendations, which had been previously communicated to Defendant Peykanu by Dr. Snyder and other providers, were largely ignored.

202. Defendant Peykanu instead further increased the use of seclusion on Mr. Hass.

203. Defendant Peykanu would continue to treat Mr. Hass until his death.

### Final Course of Treatment and Continued Seclusion

204. On May 15, 2024, Mr. Hass suffered a fall and was taken yet again to the Salem Hospital's emergency department. Mr. Hass was discharged in a wheelchair that same day to a different unit at OSH.

205. The following morning, May 16, 2024, Mr. Hass was popping wheelies in his wheelchair. An OSH nurse ordered Mr. Hass not to pop wheelies. Mr. Hass agreed but, seconds later, began to manipulate the wheelchair wheels to pop a wheelie. The OSH nurse removed his

wheelchair and Mr. Hass resisted. In response, Mr. Hass was placed in manual restraints and locked seclusion for approximately three hours. He was kept in locked seclusion for an additional six days.

206.    On May 21, 2024, Mr. Hass underwent a Functional Assessment of Behavior by Scott Ketaineck, Ph.D. The assessment found that Mr. Hass's cognition remained essentially intact outside of episodes of confusion.

207.    Because of a urology appointment, Mr. Hass was released from locked seclusion in ambulatory restraints on May 22, 2024. Following his release from seclusion, Mr. Hass was on 1:1 supervision. He was calm, polite, and managing his daily activities independently. He continued to do well for over a week.

208.    When returning to his milieu on the afternoon of June 1, 2024, Mr. Hass was in an elevator with OSH staff. Mr. Hass allegedly attempted to assault one of the escorting OSH staff members, causing them to restrain him and transport him to a seclusion room in four-point restraints. The chart does not describe what the alleged "assault" involved.

209.    Mr. Hass was kept in locked seclusion for eighteen days.

210.    On June 19, 2024, an OSH swing shift nurse finally released Mr. Hass from seclusion. He was cheerful and interacted well with others.

211.    On the evening of June 20, 2024, Mr. Hass reportedly became assaultive toward OSH staff. He was placed in four-point restraints and put in locked seclusion.

212.    Mr. Hass was kept in locked seclusion for a week.

213.    On the afternoon of June 26, 2024, Mr. Hass was released from seclusion. He was pleasant, cooperative, and independent for the following day and a half.

214.    On the morning of June 28, 2024, Mr. Hass began to unbutton his shirt in the milieu. Because OSH staff interpreted this as a precursor to assault, Mr. Hass was placed in locked seclusion.

215.    While Mr. Hass was placed in locked seclusion, his seclusion room toilet filled with vomit and liquid feces and was not cleaned by OSH staff.

216.    Mr. Hass fully immersed his face and head into the toilet bowl while in seclusion, requiring OSH staff to "literally drag his dripping, filth covered face and scalp from the pool of waste" according to Defendant Bell.

217.    In response, Defendant Bell maximized Mr. Hass's dose of phenobarbital to reduce aggression.

218.    By July 2, 2024, Mr. Hass was able to shower, wear clothes, eat his meals, and comply with medications. An OSH registered nurse released him from locked seclusion at 7:35 p.m. that day.

219.    On the evening of July 4, 2024, Mr. Hass was lying in a seclusion room resting in bed. He was unclothed and answered questions. When an OSH doctor asked him why he was unclothed, Mr. Hass gave an answer that the doctor could not fully hear. Because removing clothing was a supposed precursor to violence, Mr. Hass was placed in locked seclusion.

220.    Mr. Hass again began to drink toilet water in seclusion. On July 6, 2024, Mr. Hass "had a 75 minute run of putting his head in the toilet water and raising his head for air."

221.    Mr. Hass was released from locked seclusion on July 9, 2024. He interacted well and was observed talking and laughing with peers and staff.

222.    On July 10, 2024, Mr. Hass continued to engage with staff, eat all of his meals, and remain compliant with his medication. There were no behaviors of concern all day.

223.    In the morning and afternoon of July 11, 2024, Mr. Hass complied with his medication regimen and was social with staff and peers.

224.    By the evening of July 11, 2024, OSH staff reported that Mr. Hass was "acting 'funny.'" Rachel Inman, RN subsequently found Mr. Hass in a unlocked seclusion room naked and staring at the ceiling. She locked the door and noted that he was "[n]ow in locked seclusion."

**Kenneth Hass Was Placed in Locked Seclusion in Lieu of Any Treatment**

225.    Mr. Hass would not leave locked seclusion for the rest of his life. He died in a locked room on March 18, 2025, after 250 consecutive days in seclusion.

226.    Prolonged seclusion is a well-established risk factor for physical deconditioning, cognitive decline, psychiatric worsening, and increased medical complications. Mr. Hass's extended isolation further reduced staff interaction and opportunities for assessment, increasing the likelihood that changes in his condition would go unrecognized.

227.    While in seclusion, Mr. Hass was not provided active, individualized, psychiatric treatment. He was contained in isolation for long beyond the authorized time period without appropriate review. Instead, locked seclusion was used a substitute for treatment and often as a punishment.

228.    Mr. Hass was repeatedly subjected to locked seclusion by many doctors at OSH. During the 250-day seclusion that ended in his death:

      a.    Defendant Ranganathan extended Mr. Hass's seclusion approximately 612 times, often without sufficient clinical justification and without ensuring that less restrictive alternatives were meaningfully attempted or implemented;

      b.    Defendant Peykanu extended Mr. Hass's seclusion approximately 536 times, often without sufficient clinical justification and without ensuring

that less restrictive alternatives were meaningfully attempted or implemented;

c. Defendant Gundroo extended Mr. Hass's seclusion approximately 382 times, often without sufficient clinical justification and without ensuring that less restrictive alternatives were meaningfully attempted or implemented;

d. Defendant Muppaneni extended Mr. Hass's seclusion approximately 256 times, often without sufficient clinical justification and without ensuring that less restrictive alternatives were meaningfully attempted or implemented;

e. Defendant Christianson extended Mr. Hass's seclusion approximately 186 times, often without sufficient clinical justification and without ensuring that less restrictive alternatives were meaningfully attempted or implemented;

f. Defendant Bowers extended Mr. Hass's seclusion approximately 160 times, often without sufficient clinical justification and without ensuring that less restrictive alternatives were meaningfully attempted or implemented;

g. Defendant Chotalia extended Mr. Hass's seclusion approximately 148 times, often without sufficient clinical justification and without ensuring that less restrictive alternatives were meaningfully attempted or implemented;

h. Defendant Hiester extended Mr. Hass's seclusion approximately 138 times, often without sufficient clinical justification and without ensuring

that less restrictive alternatives were meaningfully attempted or implemented; and

i.    Defendant Walker extended Mr. Hass's seclusion approximately 94 times, often without sufficient clinical justification and without ensuring that less restrictive alternatives were meaningfully attempted or implemented.

229.    During this time, Defendant Bell reviewed and approved every seclusion lasting longer than a day.

230.    While Defendant Bell continued to approve Mr. Hass's seclusion, Mr. Hass experienced progressive physical and psychiatric deterioration, including impaired mobility, increased fall risk, medical vulnerability, and behavioral dysregulation. These conditions are well-recognized consequences of prolonged immobilization, lack of therapeutic engagement, and inadequate medical monitoring. They were clinically foreseeable and therefore preventable.

231.    The bathroom attached to Mr. Hass's locked seclusion room became a known and recurring source of risk. Mr. Hass engaged in unsafe behaviors in this space, including climbing, falling, and interacting with fixtures in a manner that placed him at risk of injury. These risks were repeatedly observed, documented, and known to staff. Staff frequently locked off access to the bathroom door, but no effective or consistently implemented plan was developed to mitigate the hazards associated with this environment.

## I.  Mr. Hass Repeatedly Fell while in Locked Seclusion

232.    Mr. Hass's known fall issue worsened while he was in locked seclusion:

a.    On July 17, 2024, Mr. Hass fell in the bathroom and hit his head.

b.    On July 22, 2024, Mr. Hass fell when trying to stand up and struck his head on the padded floor.

c.    On July 30, 2024, Mr. Hass spilled juice from a fruit cup onto the floor. He slipped on the juice, falling and hitting his head on the door.

d.    On July 31, 2024, Mr. Hass again fell on the floor and hit his head.

e.    On August 1, 2024, Mr. Hass was standing in the seclusion room when he fell and landed on his butt.

f.    On August 2, 2024, OSH staff noted that Mr. Hass fell and "may of [sic] hit his head."

g.    On August 4, 2024, Mr. Hass slipped on urine on the floor and hit his head.

h.    On August 9, 2024, Mr. Hass fell a few times, "possibly due to deconditioning from the prolonged restraints."

i.    On August 10, 2024, Mr. Hass suffered a "controlled fall" which caused a laceration to his elbow and a small amount of blood.

j.    On August 13, 2024, Mr. Hass fell on the floor, hitting the wall with his back and head. He got back up but "appeared wobbly."

k.    On August 14, 2024, Mr. Hass tried to get up from his mattress, stumbled on his feet, fell, and hit his head.

l.    On August 17, 2024, Mr. Hass fell while walking toward the door, and suffered "minimal contact" of his head against the floor.

m.    On August 20, 2024, Mr. Hass defecated and urinated in his room. He slipped on the urine and fell onto the floor.

n.    On August 23, 2024, Mr. Hass fell after defecating on the floor and slipping in his feces.

o.   On August 24, 2024, Mr. Hass was standing with an unsteady gait when he fell sideways onto the floor and landed on his knees.

p.   On September 16, 2024, Mr. Hass fell twice within six minutes, hitting his head on the back of the wall at least one of these times.

q.   On September 24, 2024, Mr. Hass fell while walking toward his anteroom door. OSH staff communicated with Mr. Hass through the locked door. He told OSH staff he did not hit his head, refused a vitals check, and refused a fall assessment.

r.   On September 29, 2024, Mr. Hass stumbled and hit his head on the door. OSH staff noted that he was bleeding from a previous injury from his chin that had not been documented.

s.   On October 6, 2024, OSH observed Mr. Hass sliding across urine and feces on the floor, losing balance, falling, getting back, up sliding again, and hitting his body on the wall.

t.   On October 9, 2024, OSH observed Mr. Hass "purposefully" sliding on the seclusion room floor covered in his urine. He slipped and fell while doing so.

u.   On October 13, 2024, Mr. Hass was running, slipped on urine on the floor, and fell.

v.   On October 23, 2024, an OSH nurse witnessed Mr. Hass fall and reported that he may have hit his head. The OSH nurse did not enter the room due to Mr. Hass's "history of unprovoked aggression."

w.   On November 27, 2024, Mr. Hass fell on his right side while pacing, but did not appear to hit his head. The OSH staff assigned to 1:1 observation

was unable to obtain a visual as Mr. Hass was "in seclusion and unsafe to approach."

x. On November 30, 2024, Mr. Hass was urinating in the seclusion room floor when he slipped on the urine and fell backwards. An OSH nurse noted that "it was unclear if [Mr. Hass] hit their head" but did not enter the seclusion room or offer Mr. Hass assistance as he had "verbalized thoughts of wanting to hurt others during [a] prior RN assessment."

y. On December 4, 2024, Mr. Hass slipped on milk and hit the back of his head on the floor. He reported pain and feeling lightheaded, but there were "no orders for neuro checks."

z. On December 9, 2024, Mr. Hass was walking around the seclusion room and singing. He tripped on trash that he "refuses to pick up" and fell, but did not hit his head. He did report serious neck pain after the fall.

aa. On December 20, 2024, access to the seclusion room bathroom had been opened. Mr. Hass jumped from the sink, onto the toilet, and onto the floor at 5:35 p.m. OSH staff notified the nurse on call, who told them that stopping Mr. Hass "wasn't worth the risk of harm to staff." Instead, the OSH nurse put a mattress in the bathroom for Mr. Hass to fall onto. Mr. Hass fell onto the mattress five additional times in the next two and a half hours, striking his head repeatedly on the wall and floor. No neurological assessments were done "for safety due to patient stating, 'fuck you bitch' and giving staff the middle finger." After this episode, Mr. Hass's bathroom access was curtailed because of the fall risk it posed.

bb.　On December 20, 2024, OSH nurses repeatedly reported Mr. Hass's falling issue to Defendant Walker, the psychiatrist on call. She instructed nurses to place a mattress in the bathroom and let Mr. Hass jump off the counter "so long as he was jumping onto mattress and not injuring self."

cc.　On December 21, 2024, Mr. Hass was moved to a new seclusion room, but OSH staff failed to lock the bathroom door. When OSH staff walked to check on Mr. Hass, they found him jumping from the sink onto the bathroom floor. OSH staff closed the bathroom door with Mr. Hass inside. He continued to jump and fall while they formulated a plan. After they opened the door, OSH security staff refused to engage Mr. Hass and watched him fall several additional times.

dd.　On January 2, 2025, Defendant Peykanu asked Mr. Hass about his falls in the bathroom. Mr. Hass told Defendant Peykanu that he "was doing trust falls with God."

ee.　On January 9, 2025, Mr. Hass slipped on a urine puddle, fell, and hit his head three times within an hour. The OSH nurse on call assessed Mr. Hass's injuries through a locked door, but did not perform a neurological examination or take his vitals.

ff.　On January 11, 2025, Mr. Hass slipped on an unknown liquid and fell on his face. OSH staff were unable to perform a neurological examination "due to staff safety."

gg.　On January 14, 2025, Mr. Hass fell after stepping on his blanket. This fall was recorded by OSH staff on a "seclusion flowsheet" but not in Mr. Hass's chart notes.

hh.    On February 27, 2025, Mr. Hass slipped on urine and fell, but did not hit his head.

233.    During this time period, OSH doctors performed repeated "Fall Risk Assessments." Each of these assessments indicated that Mr. Hass was a high fall risk, and that his medications were contributing to his fall risk, but failed to formulate a plan to reduce his fall risk.

234.    Often, these Fall Risk Assessments included a review of his medications by a pharmacist. Each of these pharmaceutical reviews indicated that many of Mr. Hass's medications were contributing to his fall risk. They consistently contained the same "treatment plan":

```
PLAN:

Recommendations:

No specific recommendations.

General recommendation - reduce the dosage or eliminate medications where the
possible fall risk is greater than the benefit derived
```

235.    This "[g]eneral recommendation" was ignored by Mr. Hass's treating OSH doctors.

236.    Mr. Hass's final Fall Risk Assessment took place on February 11, 2025. It determined that Mr. Hass was a high fall risk, and that at least five medications were contributing to his fall risk.

237.    The final Fall Risk Assessment was accompanied by an OSH pharmacist's review, also on February 11, 2025. The OSH pharmacist noted that Mr. Hass had only suffered two falls in the last ninety days—November 27 and November 30, 2024. The OSH pharmacist did not acknowledge Mr. Hass's repeated documented falls on December 4, December 9, December 20, December 21, January 9, January 11, or January 14. The OSH pharmacist noted

that no vital measures had been taken in the last 30 days. Based on this review, the OSH

pharmacist made the following recommendation:

```
RECOMMENDATIONS:

1.No specific recommendations, but general recommendations are reducing the
dosage (where possible), extend the dosing frequency, or eliminate
medications where the possible fall risk is greater than the benefit derived.
```

238.    This recommendation was ignored.

## II.    Mr. Hass Repeatedly Drank Water from the Toilet While in Locked Seclusion

239.    Psychogenic polydipsia is a life-threatening condition characterized by a

psychological compulsion to consume excessive amounts of water. It is an extremely common

condition among psychiatric patients; between 6-20% suffer from the condition.

240.    The excessive consumption of water due to psychogenic polydipsia can lead to

"water intoxication." Drinking too much water decreases the electrolytes in a person's body and

causes their cells to swell. Water intoxication can cause nausea, vomiting, muscle weakness,

confusion, and death.

241.    Throughout the course of his treatment and seclusion, Mr. Hass continued to

exhibit untreated psychogenic polydipsia, including drinking from the toilet and interacting with

contaminated water sources in the seclusion room. These behaviors significantly increased the

risk of infection, aspiration, and metabolic imbalance in an already medically compromised

patient.

242.    Drinking toilet water was already a long established risk factor for Mr. Hass. He

had consumed excessive toilet water when first arrested at the Buckley Detoxification Center in

2021. He had consumed excessive toilet water when awaiting transfer to OSH in the winter of

2021 and 2022. He repeatedly consumed excessive toilet water when placed in seclusion at OSH,

including summer of 2022, fall of 2023, and spring of 2024.

243.    Soon after his final locked seclusion began, Mr. Hass continued to dunk his head in the toilet and drink toilet water:

   a.    On July 15, 2024, Mr. Hass was repeatedly dunking his head in the toilet. Defendant Peykanu ordered his bathroom door in seclusion to be locked.

   b.    By the next day, the bathroom was unlocked despite Defendant Peykanu's order. At about 5 p.m. the next day, Mr. Hass again began to put his head in the toilet. Staff put him in four-point restraints in locked seclusion for seven hours.

   c.    On July 17, 2024, Mr. Hass was "putting his head into commode in and out throughout the shift."

   d.    On a July 30, 2024, visit, Defendant Bell noted that "Mr. Hass is currently generally naked, actively consuming his own feces and drinking urine from the toilet, requiring physical restraint to pull his head from a toilet bowl filled with urine feces, vomit, or some unholy combination."

   e.    On August 2, 2024, Defendant Bell again noted that Mr. Hass "has been consuming his feces, drinking his own urine, and we have had to lock the bathroom multiple times to keep him from submerging his face and head into a toilet bowl filled with waste and/or vomit."

   f.    On August 29, 2024, Mr. Hass was observed "kneeling in front of the toilet and repeatedly drinking from it."

   g.    On October 23, 2024, Mr. Hass was again found "dunking head in toilet, drinking from toilet, [and] eating feces from toilet."

h.  On October 24, 2024, Mr. Hass drank water from the toilet. On that day, the bathroom door was locked given Mr. Hass's history of dunking his head in the toilet.

i.  The bathroom remained locked until December 15, 2024, for "Mr. Hass's safety." On that day, he had been using the bedpan and urinal as instructed by OSH staff. His treating OSH nurse praised him, and Mr. Hass was "smiling widely and seeming to be proud of himself." Mr. Hass asked "when do I get to come out?" The OSH nurse did not release him from seclusion, but did discuss opening access to the bathroom.

j.  On December 16, 2024, Mr. Hass agreed to safe use of the bathroom when evaluated by Defendant Peykanu. The bathroom was opened for access at 2:25 p.m. with a recommendation to "limit access to BR if [patient] begins unsafe behaviors / head in toilet." Mr. Hass asked for a change of clothing, towels, soap, shampoo, and a washcloth so he could shower.

k.  By that afternoon, Mr. Hass was "bending over the toilet and appear[ed] to be drinking from the toilet." Access to the toilet was not restricted in response.

l.  On December 18, 2024, the bathroom door remained open, but Mr. Hass was "not using it appropriately."

m.  By December 20, 2024, Mr. Hass began to fall in the bathroom. The bathroom door was permanently locked and inaccessible for the rest of his life.

244.  Because of these issues, OSH staff were frequently instructed to monitor Mr. Hass's water intake but were not told why.

Page 54 of 114 – COMPLAINT

245. Despite the repeated documented instances of Mr. Hass's excessive and inappropriate water intake, OSH doctors did not diagnose Mr. Hass with psychogenic polydipsia at any point.

### III. Mr. Hass Was Tied to a Bed for Days While Already in Seclusion

246. While Mr. Hass was in locked seclusion, OSH staff would frequently place him in four-point restraints to change his room and forcibly inject him with medication. Those behaviors would often result in Mr. Hass's responding with aggression. OSH staff would respond by placing him (or leaving him) in four-point restraints and seclusion for hours or even days:

a. On July 20, 2024, Mr. Hass had been in seclusion for over a week. Because he began banging his head for a prolonged period, Defendant Bowers placed him in four-point restraints. He was not released for thirteen hours and twenty minutes.

b. On July 22, 2024, Mr. Hass was spitting at OSH staff. Defendant Peykanu placed Mr. Hass in four-point restraints. He was not released for sixteen hours and forty-five minutes.

c. On August 7, 2024, Mr. Hass refused his medication. Defendant Chotalia placed Mr. Hass in four-point restraints so that he could be forcibly injected with his medication. The four-point restraint orders were continued by Defendants Peykanu and Christianson. Mr. Hass was not released for thirty-six hours.

d. On August 25, 2024, Mr. Hass "responded with physical aggression" when OSH staff attempted to forcibly inject him with medication. He was placed in four-point restraints for six hours and fifteen minutes. After three

hours and fifty-five minutes out of restraints, Defendant Bowers placed Mr. Hass in four-point restraints for "high risk of aggression." Mr. Hass was not released for another fourteen hours.

e.   On September 3, 2024, Mr. Hass was "combative" when staff attempted to forcibly inject him with medication. Defendant Peykanu placed him in four-point restraints. After approximately twelve hours in restraints, Mr. Hass soiled himself and a bedsore began to open, but he was not released. Four-point restraints were continued by Defendant Christianson until Mr. Hass was finally released after twenty-five hours and eighteen minutes.

f.   On September 10, 2024, Mr. Hass was "combative when administering medications." Defendant Peykanu placed him in four-point restraints, which were continued by Defendant Christianson due to Mr. Hass "remaining mute and not engaging with staff." Mr. Hass was released after thirty hours and twenty minutes in four-point restraints.

g.   On September 18, 2024, Mr. Hass was singing the SpongeBob SquarePants theme song when OSH staff approached to forcibly inject him with medication. He became combative and Defendant Peykanu placed him in four-point restraints, resulting in Mr. Hass suffering a chin laceration. Defendant Peykanu, Hiester, and Bowers continued Mr. Hass's four-point restraints for a total of fifty-seven hours and forty-three minutes.

h.   On September 24, 2024, Mr. Hass was in a "pleasant mood" until he asked OSH staff to unlock the bathroom door. When OSH staff told Mr. Hass that they would when it was "safe to do so," he started spitting and

swinging at OSH staff. He was placed in restraints by Defendant Ranganathan. While in four-point restraints, Mr. Hass apologized "to multiple staff throughout the shift," asked staff for forgiveness, and was "in tears all day." These restraints were continued by Defendant Ranganathan and Defendant Hiester until Mr. Hass was finally released to seclusion after thirty-six hours and forty-eight minutes.

i.    On September 29, 2024, at 8:45 a.m., OSH security staff entered Mr. Hass's room with shields. Mr. Hass ran towards security, stumbled, and hit his head on the door. He was placed in four-point restraints by Defendant Bowers. These restraints were continued by Defendants Bowers and Peykanu until Mr. Hass was finally released to seclusion after fifty-one hours and fifty-five minutes.

j.    Mr. Hass spent almost a day out of four-point restraints until OSH staff attempted a blood draw on October 2, 2024. Mr. Hass became aggressive and was placed in four-point restraints by Defendant Peykanu. The restraints were continued by Defendants Ranganathan and Hiester until Mr. Hass was released to seclusion after twenty-two hours.

k.    On October 7, 2024, Mr. Hass became combative when OSH security staff entered his room with shields and attempted to forcibly inject him with medication. Defendant Peykanu placed him in four-point restraints for twenty-eight hours and five minutes.

l.    On October 14, 2024, OSH security staff entered Mr. Hass's room with shields. Mr. Hass charged the door and was placed in four-point restraints by order of Defendant Peykanu. The restraints were continued by

Defendants Peykanu, Gundroo, and Christianson for fifty-four hours and forty-three minutes.

m.  On October 17, 2024, OSH staff entered Mr. Hass's room with shields. Mr. Hass charged the door and was placed in four-point restraints by order of Defendant Peykanu. After eighteen hours and fifty-three minutes in four-point restraints, Mr. Hass began to experience a seizure, choke, vomit, and turn blue. He was removed from four-point restraints so that OSH staff could provide suction and clear his airway. Defendant Peykanu determined that Mr. Hass should not be taken to an emergency room.

n.  Throughout October, November, and December 2024, Mr. Hass was repeatedly placed in four-point restraints for eight to twelve hours a time. He was almost always placed in restraints because he "responded with aggression" after being approached with shields or for forcible injection of medication.

o.  On December 23, 2024, OSH staff entered Mr. Hass's room to forcibly inject him with medication. Mr. Hass "ran towards staff in a motion to attack." Defendant Peykanu placed him in four-point restraints. After approximately eight hours, OSH staff attempted to remove the restraints without success. Mr. Hass was finally released to seclusion after 20 hours and 20 minutes in restraints.

p.  On January 8, 2025, OSH staff entered Mr. Hass's room with shields to forcibly inject him with medication. Mr. Hass reacted aggressively, and Defendant Peykanu placed him in four-point restraints for nine hours and twenty-one minutes.

Page 58 of 114 – COMPLAINT

q.  On February 2, 2025, Mr. Hass became agitated and attacked an OSH staff member who entered the room with one of Mr. Hass's family members on the phone. Mr. Hass was placed in four restraints by Defendant Muppaneni. While in restraints, Mr. Hass was asked why he had attacked a staff member, and injured a female nurse. Mr. Hass responded "I didn't attack [the female nurse]! . . . I attacked the other guy! I don't attack women!" Restraints were continued by Defendant Peykanu for a total of twenty-eight hours. Upon being sedated and released to seclusion, Mr. Hass did not want to be taken out of restraints, but "was educated that he had been in restraints for over 12 hours, which is not ideal for the body."

r.  On March 4, 2025, Defendant Peykanu attempted to forcibly inject Mr. Hass with medication, and Mr. Hass responded aggressively. Defendant Peykanu placed him in four-point restraints. These restraints were continued by Defendant Ranganathan for a total of twenty-five hours and fifty-five minutes.

## IV. Mr. Hass Was Forced to Live in His Own Excrement

247.  During the last eight months of his life in locked seclusion, Mr. Hass became increasingly ill. As he spent month after month in locked seclusion, he began to eat feces and urine and smear feces, urine, and vomit on himself and the walls of his room.

248.  Mr. Hass was forced to live in seclusion rooms covered in feces, urine, vomit, and trash. He was often unable to change rooms, use a bathroom, or bathe for weeks on end.

249.  Instead of cleaning or otherwise addressing the filthy conditions of these seclusion rooms, OSH staff would put a rolled-up towel under the door of the rooms so they could ignore the smell.

250.    OSH staff would move Mr. Hass to a new locked seclusion room when his living conditions were truly intolerable.

251.    For example, Mr. Hass lived in the same seclusion room from September 29 until October 14, 2024. By that point, his "seclusion room was soiled with feces, urine, and other liquids and food. [Mr. Hass] had feces under his nails and on his toes." During his morning assessment on the 14th, Mr. Hass told OSH staff that "he thinks he's in 'hell.'"

252.    Mr. Hass's filthy living conditions became a given over the next several months:

   a.    Mr. Hass was transported to a new seclusion room on October 14, 2024. By October 17, 2024, that room was "very dirty, filled with poop, puke, urine and other garbage putting him at risk for infections and infestations."

   b.    On October 21, 2024, Mr. Hass had "feces smeared all over his body." He was cleaned and transported to a new seclusion room.

   c.    On October 27, 2024, there were "[f]eces all over the room" and "food or feces on [Mr. Hass's] face."

   d.    On November 3, 2024, Mr. Hass's "room is filthy" and Mr. Hass "has feces on him especially his feet."

   e.    On November 22, 2024, a room change was required because "it was covered all over in feces and [Mr. Hass] had feces all over his body."

   f.    On December 2, 2024, Mr. Hass was "covered in feces." "Feces and trash [were] spread throughout the room. Puddles of urine visible on floor." His room was "so covered in urine, feces, and trash that it was deemed an infection risk and [Mr. Hass] needed to move to a clean side room."

   g.    On December 5, 2024, "[f]eces was [*sic*] covering the wall, door handle, and anteroom door as well as on the floor and mattress. [Mr. Hass] was

noted to have feces smeared across his body, face, and in his eyelids." When asked why he was smearing feces in his room, Mr. Hass replied "because you all don't want me to."

h.    On December 25, 2024, Mr. Hass's room was "relatively clean."

i.    On December 31, 2024, Mr. Hass's seclusion room had "feces on the floor, urine puddle on the floor, and trash scattered throughout the room."

j.    On January 15, 2025, Mr. Hass had "feces smeared on his face and the anteroom door window."

k.    On February 1, 2025, Mr. Hass's room was "trashed with food . . . also malodorous from him urinating and defecating on the floor." Mr. Hass had access to a bedpan but no bathroom.

l.    On February 16, 2025, Mr. Hass's room was "very unsanitary." He had "dried feces on buttocks and feet."

m.    On March 15, 2025, his room "remain[ed] dirty with food remnants spread all over."

253.    Mr. Hass experienced repeated falls, unsafe behaviors, and environmental risks within seclusion, including climbing onto fixtures, ingesting unsafe substances, and exposure to unsanitary conditions. These events were not isolated. They were recurrent, documented, and known to staff and providers across disciplines.

254.    Despite this, doctors made no sustained corrective action, meaningful modification of treatment planning, or implementation of protective interventions sufficient to mitigate these known risks. Instead, the same conditions persisted and intensified over time.

255.    As Mr. Hass's locked seclusion dragged on, OSH staff ceased providing psychiatric treatment and documenting Mr. Hass's falls, unsafe behaviors, and environmental

risks. The unsafe behaviors described above are only those incidents documented in the chart notes.

256.    Within several weeks of his locked seclusion, OSH doctors had not only ceased providing psychiatric treatment to Mr. Hass; they began to assume that he would die from his mental illness.

257.    On August 5, 2024, Defendant Peykanu visited Mr. Hass in locked seclusion. He was "lying down, nude, [and] does not respond to any of my questions." Based on this assessment, Defendant Peykanu opined that "Mr. Hass presents in many ways as having a terminal psychotic illness." He extended locked seclusion for another four hours.

258.    "Terminal psychotic illness" is not a recognized medical diagnosis; it appears to be a term Defendant Peykanu created for Mr. Hass. It simply means that, for the last seven and a half months of Mr. Hass's life, his treating doctor expected him to die in the Hospital.

259.    At no time did Defendant Peykanu request from an outside expert a second opinion of Mr. Hass's diagnosis or treatment plan.

260.    On August 9, 2024, Defendant Peykanu updated Mr. Hass's treatment plan during a scheduled review. In that treatment plan, he noted "a terminal psychotic illness" as one of Mr. Hass's principal problems.

261.    On August 23, 2024, Defendant Walker, the OSH Superintendent, visited Mr. Hass. She noted that he "continue[d] in prolonged seclusion," did not speak to her, and did not make eye contact. Based on this examination, she also opined that "Mr. Hass presents in many ways as having a terminal psychotic illness." She extended his locked seclusion for another four hours.

262.    For the last seven months of Mr. Hass's life, the OSH Superintendent expected him to die in the Hospital.

Page 62 of 114 – COMPLAINT

263.    Over these last months of Mr. Hass's life, the phrase "Mr. Hass presents in many ways as having a terminal psychotic illness" was repeated dozens of times by many different OSH staff members.

264.    The phrase permeated the chart notes, treatment plans, seclusion orders, and expectations OSH staff set about his treatment. By the end of his life, the idea that "Kenneth will die in this hospital" was a running joke among OSH staff.

**Sierra Hass Was Appointed As Kenneth Hass's Legal Guardian**

265.    Ms. Hass contacted OSH for years so that she could visit her brother. OSH did not allow her to visit or provide detailed information about Mr. Hass's medical condition.

266.    On May 14, 2024, staff at OSH contacted Ms. Hass to update her on Mr. Hass's medical status and discuss possible guardianship.

267.    Ms. Hass worked with the Hospital over the next several months so that she could become Mr. Hass's legal guardian.

268.    Ms. Hass retained a lawyer to prepare a Petition for Appointment of Guardian, which was filed in Marion County Circuit Court on October 10, 2024. Pursuant to the petition, a social worker was appointed as Court Visitor. The Court Visitor contacted Ms. Hass, evaluated Mr. Hass, and reviewed documentation from OSH to determine whether he was incapacitated and in need of a guardian.

269.    The Court Visitor filed a report on November 15, 2024, finding that the appointment of a guardian was necessary and recommending that Sierra Hass be appointed.

270.    On November 19, 2024, Marion County Circuit Court found by clear and convincing evidence that Mr. Hass was incapacitated, that the appointment of a guardian was necessary, and that Ms. Hass was suitable and willing to serve. The Court entered a judgment appointing Ms. Hass as guardian for Mr. Hass.

271.     By law, this judgment appointing Ms. Hass guardian provided her the ability to consent, refuse consent, or withhold or withdraw consent to health care on Mr. Hass's behalf. The judgment also explicitly provided that Ms. Hass had the power to "consent to health care and to services" for Mr. Hass. Finally, the judgment explicitly provided that Ms. Hass had "custody of [Mr. Hass] and may establish [Mr. Hass's] place of abode."

### Oregon State Hospital Disregarded Mr. Hass's Family's Concerns

272.     Once Sierra Hass was appointed Mr. Hass's legal guardian, she became actively involved in his care. As soon as November 25, 2024, OSH staff began to inform Ms. Hass when Mr. Hass was put in four-point restraints.

273.     Ms. Hass was finally allowed to visit her brother. She set up weekly visits with Mr. Hass and weekly meetings with Defendant Peykanu to discuss Mr. Hass's care.

274.     By December 12, 2024, Ms. Hass saw Mr. Hass for the first time in years; she was accompanied by Defendant Peykanu. Mr. Hass was "hostile and irritated"; he insisted that Ms. Hass was not his real sister, refused to engage with her, and started yelling profanities.

275.     Ms. Hass visited Mr. Hass on December 19, 2024, with Defendant Peykanu. Ms. Hass and Mr. Hass were able to interact, but Mr. Hass believed that Defendant Peykanu and Ms. Hass were demons.

276.     Ms. Hass visited Mr. Hass again on December 26, 2024. Mr. Hass told her to "go away," to "stop stalking me," and that "I don't want to see you."

277.     Ms. Hass planned to visit Mr. Hass on January 2, 2025, but OSH staff called her and told her she could not.

278.     Over the few times Ms. Hass was able to visit her brother, his condition improved significantly. Mr. Hass stopped calling Ms. Hass a "demon," listened to memories that they shared, and corrected Ms. Hass when she got small details wrong.

279. Ms. Hass attempted to visit Mr. Hass on January 9, 2025, but OSH security told her that she could not see him "due to needing an exception form and approval from the PET team for each scheduled visit." The OSH social worker who met Ms. Hass at the front entrance "was unaware of the new visitation policy" and had to reach out to the OSH registered nurse on call.

280. Over the next several weeks, Ms. Hass repeatedly tried to visit Mr. Hass but was repeatedly turned away due to OSH staff concerns about "safety" and the lack of "PET approval."

281. It is still unknown who or what the PET team or PET approval is.

282. On or around January 15, 2025, Ms. Hass instructed Defendant Peykanu to take Mr. Hass off all medications. Defendant Peykanu agreed to do so.

283. Despite verbally agreeing to cease all medications, Defendant Peykanu did not change Mr. Hass's medications in any way.

284. On or around January 22, 2025, Ms. Hass again met with Defendant Peykanu. It was evident that Defendant Peykanu had not changed Mr. Hass's medications as Ms. Hass had instructed him to do.

285. By late January, 2025, Ms. Hass told Defendant Peykanu that she wanted to remove Mr. Hass from OSH. Defendant Peykanu told her that she could not remove Mr. Hass without his permission, which he would not grant.

286. On February 7, 2025, a social worker obtained "PET approval with safety guidelines in place" and began the process of scheduling visits with Ms. Hass.

287. Ms. Hass again attempted to visit Mr. Hass on February 11, 2025. OSH staff refused to let her see her brother, but insisted that she sign an "application for voluntary admission" because Mr. Hass's civil commitment was coming to an end.

288.    Ms. Hass would not have another chance to visit her brother.

289.    Each time Ms. Hass saw her brother, he was not the person she remembered. Mr. Hass was physiologically and psychologically decompensated. He was often covered in feces, vomit, other bodily fluids, and/or trash.

290.    Ms. Hass observed a towel placed under the door of Mr. Hass's seclusion room so that OSH staff did not have to smell him.

291.    Ms. Hass was forced to witness OSH staff mistreat and dehumanize her disabled brother.

### Oregon State Hospital Staff Raised Concerns Regarding Mr. Hass's "Care"

292.    By early 2024, many staff at OSH recognized that seclusion had become a serious issue for the Hospital generally and Mr. Hass specifically.

293.    These OSH staff tried to help Mr. Hass and others like him. They were consistently ignored or rebuffed by OHA and OSH leadership.

294.    As discussed in detail above, in 2023 and 2024, the Hospital failed several federal inspections by CMS. Chief among these failures were excessive use of seclusion, lack of training on proper use of seclusion, and insufficient documentation of seclusion.

295.    In response, Defendant Hathi and OHA scheduled a call with a consulting firm—Chartis—in August 2024. The purpose of the call was to review OSH following these failed federal inspections, which had placed OSH at risk of losing federal funding unless it fixed the deficiencies CMS investigators had uncovered.

296.    Chartis subsequently sent Defendant Hathi an overview of potential services, which Defendant Hathi forwarded to Defendant Walker. Defendant Walker notified OHA that OSH would like to work with Chartis.

297.    In that role, Chartis produced a comprehensive report that identified restraint and seclusion practices as a major area for improvement.

298.    On November 15, 2024, Chartis presented this report to Defendant Hathi, Defendant Walker, and other executives with OHA and OSH.

299.    Chartis' presentation to Defendants Hathi, Walker, OHA, and OSH labeled seclusion issues as "high priority – should be corrected ASAP."

300.    Chartis emailed Defendant Hathi a copy of the presentation and report, which informed her that "Patients [were being] held in **seclusion for days and weeks** without justification and not released at earliest time possible" (emphasis in original document) at OSH.

301.    Defendant Hathi failed to take urgent action to reduce seclusion practices. In December, staff at OSH began to hold initial team meetings about the issue.

302.    Over the next several months, OSH staff repeatedly met with Defendants Bell and Walker to discuss the excessive use of extended seclusion and restraints.

303.    As a result of Chartis' analysis, OSH staff created "Psychiatric Intensive Care Units." One of the major goals of these units was to reduce the use of restraints and seclusion.

304.    On January 7, 2025, OSH staff at a committee meeting presented on the importance of reducing time in seclusion. Defendant Jamieson, the OSH CFO, said she could not support the plan if it was dependent on staff overtime.

305.    In early February 2025, OSH staff at workgroups repeatedly brought up Mr. Hass as a patient in need of review. Despite OSH staff requests, OHA and OSH executives refused to consider scheduling psychiatry, psychology, social workers, rehabilitation therapists, occupational therapists, or behavior specialists for Mr. Hass outside of business hours.

306.    Over this time, the OSH Chief Nursing Officer ("CNO") repeatedly met with Defendant Bell, the Chief of Psychiatry, to discuss Mr. Hass's care. Each time, she expressed

that OSH staff were very concerned with Mr. Hass's welfare, that he had been in seclusion way too long, and that he was experiencing significant medical issues. Each time, Defendant Bell refused to release Mr. Hass from seclusion and did not order the treatment (e.g., ECT) that he had accurately stated was appropriate.

307.    On February 11, 2025, the OSH CNO met with Defendant Walker, the OSH Superintendent and CMO, to discuss seclusion and restraint practices. The OSH CNO raised concerns about Mr. Hass's extended seclusion and requested help to get him out. Defendant Walker declined to intervene.

308.    On February 27, 2025, the OSH Deputy Chief Nursing Officer ("DCNO") asked Defendant Walker for resources to help Mr. Hass get out of seclusion "ASAP." Defendant Walker responded: "You would have gotten what you needed if you would not have gone about it like a jackass."

309.    On March 5, 2025, the OSH CNO asked OSH's Clinical Administration Team for help to get Mr. Hass out of seclusion. No one responded.

310.    That same day, the OSH DCNO asked OSH's Clinical Administration Team for help to get Mr. Hass out of seclusion. No one responded.

311.    On March 9, 2025, the OSH DCNO filed a complaint with CMS concerning the treatment of Mr. Hass.

312.    On March 12, 2025, the OSH DCNO asked OSH's Clinical Administration Team for help to get Mr. Hass out of seclusion. No one responded.

313.    From July through March 2025, a significant number of other OSH employees—from direct care staff to directors—raised concerns or asked OHA and OSH administrators for help getting Mr. Hass out of seclusion. They were all ignored or refused. Many of these OSH employees later recited these efforts to assist Mr. Hass to the CMS auditors.

Page 68 of 114 – COMPLAINT

**Death**

314.    By the evening of March 17, 2025, Mr. Hass was still in locked seclusion but in better than usual spirits. When visited by Defendant Peykanu, he asked for fruit and some juice. Defendant Peykanu threw an apple at him and extended his seclusion for an additional four hours.

315.    The next morning, Mr. Hass was seen by Defendant Okeke, a psychiatric nurse practitioner. She noted that Mr. Hass was "surprisingly clothe[d] and much more verbal than he has been for the last couple of weeks. He said that he wanted to get out and get some fresh air," which he had not done in months. Mr. Hass further asked Defendant Okeke how this could be accomplished, and told her "he would be willing to go 'in shackles.'"

316.    Defendant Okeke made a plan that could ultimately result in Mr. Hass getting some fresh air: If Mr. Hass agreed to change rooms and submit to the injection of psychiatric medication, OSH doctors would be "open to whatever suggestions he could come up with for increased engagement."

317.    Defendant Okeke and the treatment team performed a manual hold on Mr. Hass and injected him with 100 mg of long-acting haloperidol decanoate and 300 mg of long-acting olanzapine pamoate. These medications were provided in addition to 50 mg of diphenhydramine, 20 mg of intramuscular immediate-acting haloperidol, 3 mg of intramuscular lorazepam, 5 doses of acetaminophen, and 4 mg of ondansetron that were all administered on March 18, 2025.

318.    Mr. Hass again expressed that he would be willing to go outside in ambulatory restraints to get some fresh air. Defendant Okeke refused this request.

319.    Instead, Defendant Okeke agreed to open the door to Mr. Hass's bathroom "despite his history of self-harm so that he could demonstrate safety once again and reestablish how he is doing."

Page 69 of 114 – COMPLAINT

320.   Mr. Hass saw Defendant Peykanu at approximately 4 p.m. Despite his knowledge of Mr. Hass's issues with self-harm, falling, and habit of repeatedly drinking from the toilet, Defendant Peykanu agreed to unlock the bathroom door.

321.   While there were many relatively safe ways that Mr. Hass could "demonstrate safety," Defendants Okeke, Peykanu, and other OSH staff chose an option that posed a clear danger to Mr. Hass's wellbeing.

322.   Over the next several hours, Mr. Hass urinated and defecated in the bathroom. The toilet and bathroom floor became wet and slippery. As always, Mr. Hass walked unsteadily over the bathroom floor.

323.   Defendant Ortega was assigned to 1:1 supervision of Mr. Hass from 7-8 p.m. During that time, Mr. Hass drank 35 cups of water from the toilet. Drinking excessive water leads to water intoxication.

324.   At 7:59 p.m., Mr. Hass vomited a large amount of water. Nausea and vomiting are a symptom of water intoxication.

325.   Defendant Ortega failed to document, inform staff of, or respond to this excessive water intake in any way.

326.   Defendant Kamandi was assigned to 1:1 supervision of Mr. Hass from 8-9 p.m.

327.   Because Defendant Ortega had failed to monitor Mr. Hass and failed to document Mr. Hass's behavior, Defendant Kamandi did not know that Mr. Hass had consumed 35 cups of water in the last hour.

328.    While Defendant Kamandi was assigned to 1:1 supervision of Mr. Hass, he drank 24 additional cups of water from the toilet.

329.   Defendant Kamandi failed to document, inform staff of, or respond to this excessive water intake in any way.

330. Defendant Darami was assigned to 1:1 supervision of Mr. Hass from 5-6 p.m. and 9-10 p.m. that day.

331. Because Defendants Kamandi and Ortega had failed to monitor Mr. Hass and failed to document his behavior, Defendant Darami did not know that Mr. Hass had consumed 59 cups of water in the past two hours.

332. While Defendant Darami was assigned to 1:1 supervision of Mr. Hass, Mr. Hass drank 30 additional cups of water from the toilet.

333. Defendant Darami failed to document, inform staff of, or respond to this excessive water intake in any way.

334. At 9:32 p.m., Mr. Hass climbed onto the toilet seat. In doing so, he slipped on the slick toilet seat.

335. Mr. Hass hit his head on the bathroom wall as he fell to the ground.

336. Despite being assigned to 1:1 supervision of Mr. Hass due to fall risk, Defendant Darami did not respond to Mr. Hass's fall in any way or report his fall to anyone.

337. At 9:33 p.m., Mr. Hass stood up from his fall. His gait was visibly unsteady and he staggered as he walked around.

338. Defendant Darami did nothing.

339. At 9:45 p.m., Mr. Hass tripped but did not fall.

340. Defendant Darami did nothing.

341. Several minutes later, Mr. Hass tripped and did fall. He was able to get back up and walk around.

342. Defendant Darami did nothing.

343. Michelle Tellez-Calzada was assigned to 1:1 supervision of Mr. Hass from 10-11 p.m.

344.    When Ms. Tellez-Calzada arrived for her shift, Defendant Darami told her to watch Mr. Hass because he had stumbled a few times.

345.    Because Defendants Ortega, Kamandi, and Darami had failed to monitor Mr. Hass and failed to document Mr. Hass's behavior, Ms. Tellez-Calzada did not know that Mr. Hass had consumed 89 cups of water (about 5.1 gallons) in the past three hours.

346.    Water intoxication can develop after drinking as little as a gallon of water over an hour or two.

347.    Soon after Ms. Tellez-Calzada started her shift, Mr. Hass slipped and fell on the slick floor.

348.    As required, Ms. Tellez-Calzada reported Mr. Hass's fall to Defendant Cockroft, the supervising registered nurse.

349.    Defendant Cockroft asked Ms. Tellez-Calzada if Mr. Hass hit his head. When Ms. Tellez-Calzada stated that Mr. Hass had not hit his head, Defendant Cockroft told Ms. Tellez-Calzada "you don't have to chart it."

350.    Defendant Cockroft did not otherwise respond to Mr. Hass's fall.

351.    Defendant Adenekan, another registered nurse, entered Mr. Hass's room just after Mr. Hass's fall to perform an hourly assessment. Ms. Tellez-Calzada informed Defendant Adenekan that Mr. Hass was not using the bathroom correctly. She also informed Defendant Adenekan that Mr. Hass was a fall risk, that he should change rooms, and that they should let the lead nurse know about these issues.

352.    Defendant Adenekan responded "it's too late. I'm not going in. You're crazy. Let the lead know what?" Defendant Adenekan did not otherwise respond to Mr. Hass's issues.

353. Shortly thereafter, Defendant Christianson entered the room. Ms. Tellez-Calzada informed Defendant Christianson that Mr. Hass wasn't "using the bathroom right," that the floor was slick, and that Mr. Hass was a fall risk.

354. Defendant Christianson spoke briefly to Defendant Adenekan but did not otherwise respond to Mr. Hass's fall issue. Both Defendants Christianson and Adenekan left.

355. At 10:27, Mr. Hass fell onto his back, but did not strike his head. Ms. Tellez-Calzada was reading the book "All Good People Here" instead of watching Mr. Hass and did not witness the fall.

356. At 10:34, Mr. Hass again crawled up to stand on the toilet seat.

357. When Mr. Hass got on top of the toilet, his foot slipped inside the bowl. Mr. Hass fell backward off the toilet, struck his head on the door, and fell to the floor. Mr. Hass vomited as his head struck the door and floor.

358. Ms. Tellez-Calzada immediately called Defendant Cockroft and asked her to call a "Code Blue." A "Code Blue" meant that Mr. Hass was suffering a life-threatening emergency.

359. After Mr. Hass hit the ground, his face turned red. He appeared to be choking on something and was spitting white liquid foam from his mouth. His limbs were jerking and twitching.

360. Ms. Tellez-Calzada repeatedly knocked on the door and yelled "Kenny, please, Kenny." She did not enter the room because OSH doctors had created a policy forbidding staff from entering a room alone with Mr. Hass.

361. Defendant Cockroft did not immediately respond to the "Code Blue." Instead, she ran out and assembled a team to help secure Mr. Hass "[b]ecause Kenny is known to be especially aggressive."

362. Mr. Hass continued to vomit and convulse.

Page 73 of 114 – COMPLAINT

363. As OSH staff gathered around the anteroom, Defendant Cockroft did not allow them to enter Mr. Hass's room and render aid.

364. OSH staff gathered around the door and told Mr. Hass that "help was on the way," but did not enter his room to render aid.

365. About three minutes after falling, Mr. Hass's movements began to slow. His breaths became longer, slower, and deeper.

366. Finally, Mr. Hass went completely limp.

367. More than four minutes after Mr. Hass's fall, OSH staff entered his room and checked his pulse.

368. Five minutes and forty seconds after Mr. Hass's fall, OSH staff finally begin CPR compressions.

369. Fifteen minutes after Mr. Hass's fall, the Salem Fire Department and EMS entered his seclusion room. They took over lifesaving measures.

370. Forty-seven minutes after Mr. Hass's fall, he was pronounced dead. His cause of death was water intoxication.

371. The CMS audit reported none of the OSH physicians, nurses, or technicians who responded to Mr. Hass's emergency were properly trained in Code Blue emergencies, nor had they completed or updated Code Blue training. There were findings that none of the providers had received direct care training and the Oregon State Hospital had not had any recent Code Blue training drills.

372. The CMS audit found that at the time Mr. Hass fell "a multitude of staff responded to" the unit and gathered in the hallway and did not approach Mr. Hass nor render emergency aid for over five minutes. No one brought the crash cart until OSH staff entered the seclusion room and it lacked oxygen. No one started CPR for over five minutes. No one used the

AED that arrived with the crash cart. The audit found "significant" life threatening delays in the emergency response, a lack of understanding in emergency responses by staff, and a disorganized response causing further delay and confusion.

## DAMAGES

### Plaintiff Estate of Kenneth Hass

373.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

374.    Mr. Hass suffered extreme emotional damage from the months of seclusion, life threatening use of medication, failure to treat known and threatening medical emergencies and the use of forced medication as a result of Defendants' actions. The extensive and extraordinary use of isolation resulted in increased psychotic symptoms, delusions, hallucinations, physical conduct, which resulted in repeated injuries, bedsores, and sepsis, which were all life threatening. The extraordinary, unlawful and improper use of isolation is the pathway to the ultimate cause of Mr. Hass's death.

375.    Mr. Hass suffered continuous and unrelenting abuse by Defendants, resulting in years of distress and hopelessness. Defendants affirmatively acted to place Mr. Hass in a worse position than he was upon admission. The danger these Defendants created included the worsening of Mr. Hass's mental health conditions, a serious danger to Mr. Hass's medical conditions, increased symptoms and higher likelihood for increased psychosis, post-traumatic stress disorder, and the complete inability to function had he been allowed to recover and leave the Hospital. Mr. Hass lived in fear and dread every day and suffered from extreme neglect giving rise to more psychotic episodes, despair, and suffering.

376.    Mr. Hass suffered significant and indescribable mental anguish, fear, anxiety, and worsening mental health and physical conditions. He became noticeably more psychotic and

even physically ill. There was no therapeutic purpose in the treatment given or even that which was withheld by Defendants.

377. Defendants' extensive reliance on four-point restraint resulted in bedsores because Mr. Hass was tied to the bed for long periods of time. These bedsores became infected, and his infections were ignored long enough to become septic.

378. As a result of Defendants' repeated and extensive failures to protect Mr. Hass, to provide him a safe, therapeutic environment, or to provide him a safe place to receive sound medical and psychiatric care, Mr. Hass was tortured and deprived of his dignity, his autonomy and his right to care and assistance. Mr. Hass believed he was in hell and that he was made to suffer.

379. As a result of Defendants' lengthy mistreatment, failed care, and deliberately indifferent care that arose nearly to a criminal level, Mr. Hass died violently and needlessly.

380. Defendants' conduct led to economic and non-economic losses to Mr. Hass during his life and to his Estate of no less than $75,000.

381. Plaintiff Estate of Kenneth Hass is entitled to treble damages for the losses it suffered under ORS 124.100(2)(b).

382. Plaintiff Estate of Kenneth Hass is entitled to its attorney fees and costs pursuant to ORS 124.100(2)(c) and 42 U.S.C. § 1988.

### **Plaintiff Sierra Hass**

383. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

384. As a foreseeable result of repeatedly witnessing the result of Defendants' treatment, detention, seclusion, neglect, and abuse of her brother, Plaintiff Sierra Hass suffered extreme, serious emotional trauma and distress, all to her non-economic damage of no less than $75,000.

## FIRST CLAIM FOR RELIEF

### 14th Amendment Substantive Due Process—Deprivation of Liberty & Failure to Protect

**(Plaintiff Estate of Kenneth Hass against Defendants Walker, Jamieson, Matteucci, Peykanu, Bell, Christianson, Bowers, Ranganathan, Gundroo, Muppaneni, Chotalia, Hiester, Darami, Cockroft, Adenekan, Kamandi, Ortega, Okeke, & John Does 1-15)**

385.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

386.    Mr. Hass had constitutionally-protected "fundamental rights" including his life and liberty pursuant to the substantive due process clause of the 14th Amendment to the United States Constitution. Defendants can be held liable for their actions and inactions that cause a deprivation of life or liberty.

387.    Defendants Walker, Jamieson, Matteucci, Peykanu, Bell, Christianson, Bowers, Ranganathan, Gundroo, Muppaneni, Chotalia, Hiester, Darami, Cockroft, Adenekan, Kamandi, Ortega, Okeke, & John Does 1-15 ("Individual Defendants") were deliberately indifferent to the rights held by Mr. Hass. The conduct by the Individual Defendants shocks the conscience given the significant opportunities to do the right thing coupled with the refusal to do so. At all material times they were acting under the color of law.

388.    Mr. Hass was mandated to the care and supervision of the State of Oregon as an involuntarily committed mental health patient whose legal capacity had been challenged. He was totally dependent on the caregivers at the Oregon State Hospital to provide him with care, housing, medical, and mental health evaluations and treatment. He had the right to be secure in his person and to be free from unnecessary and cruel confinement, treatment including unnecessary isolation. The Individual Defendants were tasked by law with protecting Mr. Hass from his own behaviors and to keep him safe. A special relationship existed between Mr. Hass and his providers entitling Mr. Hass to an elevated level of care.

389.    The Individual Defendants had a constitutional duty to protect Mr. Hass's life and his liberty interests from known and threatened harm, including their own conduct. They had an absolute duty to act to protect Mr. Hass and their failure to do so resulted in his significant and torturous conditions of confinement and ultimate death.

390.    The Individual Defendants had an absolute duty to adhere to legal and medical standards of care in the administration of evaluations, civil commitment processes, use of isolation and restraint, forced medication, and informed consent for treatment of Mr. Hass. The Individual Defendants knew their duties and knew the legal requirements based on over twenty years of litigation and negative investigations of the Oregon State Hospital. Despite their actual knowledge, they repeatedly failed to adhere their conduct and treatment to recognized legal and treatment standards.

391.    The Individual Defendants repeatedly and systematically failed to adhere to legal and community standards in numerous aspects of Mr. Hass's care, including without limitation, failure to adhere to statutory timelines on aid and assist evaluations, civil commitment process procedural violations, abusive and punitive use of isolation and restraint, abusive and punitive use of medication and treatment modalities including forced medication, consistent failure to secure an adequate diagnosis, using medication in lieu of adequate treatment, failure to secure adequate informed consent for treatment or court orders authorizing it. All of these failures were well outside acceptable medical judgment recognized by the medical and psychiatric treatment community.

392.    The treatment failures and abuses by the Individual Defendants lasted the entirety of Mr. Hass's hospitalization of nearly three years including nearly one year of isolation and confinement. The treatment and failures by the Individual Defendants were a long, continuous,

uninterrupted course of action in which the Individual Defendants all participated and were involved.

393. The Individual Defendants failed to protect or created a dangerous condition for Mr. Hass in the following non-exhaustive ways:

a. Failing to timely evaluate Mr. Hass for his ability to assist in his own defense in violation of the law;

b. Failing to provide timely and medically adequate diagnosis and to create a treatment plan to assist Mr. Hass in restoring his mental abilities;

c. Failing to timely review Mr. Hass's medications and adjust as needed and failed to ascertain what medications, if any, were required based on a scientific diagnosis;

d. Failing to secure information and background from Mr. Hass's family members;

e. Failing to timely seek a legal guardian to provide guidance on treatment and to seek approval for treatment;

f. Failing to adequately document a significant amount of treatment for Mr. Hass;

g. Failing to adequately inform Mr. Hass or his legal guardian of recommended changes in treatment or medication;

h. Failing to follow instructions by Mr. Hass's legal guardian on medications and treatment;

i. Providing false information about Mr. Hass's treatment to his legal guardian, Ms. Hass;

j.    Refusing to allow Ms. Hass to visit and witness treatment provided to Mr. Hass;

k.    Failing to adequately observe Mr. Hass and note behavior changes;

l.    Failing to consult with outside experts for further insight regarding Mr. Hass's behavior changes;

m.    Failing to seek adequate legal authority prior to civil commitment;

n.    Failing to seek adequate legal authority prior to forcible medication;

o.    Failing to seek adequate legal authority prior to providing treatment that was well outside acceptable standard of care;

p.    Failing to stop harmful and abusive medical care and treatment;

q.    Ignoring insights and recommendations of experts;

r.    Failing to provide adequate management and supervision to protect Mr. Hass from aberrant behavior and reduce his risk of fall;

s.    Failing to provide protections for Mr. Hass's medical condition, which resulted in falls, dangerous drinking, and combative behavior;

t.    Failing to seek timely and adequate medical treatment when Mr. Hass developed bedsores from his extended four-point restraint and isolation;

u.    Failing to provide care or prevention for falls;

v.    Failing to provide timely emergency treatment;

w.    Using isolation and restraint in violation of law, existing standards of care, and in a depraved manner simply because providing actual treatment for Mr. Hass was more work;

x.    Ignoring changes in Mr. Hass's behavior or response to medications including increased psychosis, increased falling, increased combativeness,

increased delusion and proceeded forward despite repeated opportunities to change treatment, reduce medications, and limit isolation;

y.   Keeping Mr. Hass in a dirty, unsanitary room covered in feces and urine, which subjected Mr. Hass to additional medical problems;

z.   Instructing staff not to intervene with Mr. Hass if he should fall or engage in self-destructive behavior while in the isolation cell; and

aa.   Ignoring concerns repeatedly expressed to them by Oregon State Hospital staff.

394.   The Individual Defendants acted with deliberate indifference to a known or obvious danger. The Individual Defendants knew of all the dangers and ramifications of their dangerous treatment of Mr. Hass and chose to act regardless of those dangers and in fact seemed to desire the most negative outcome, even concluding Mr. Hass was a hopeless and terminal cause.

395.   As a result of the Individual Defendants' conduct, Mr. Hass suffered in the many ways described above.

**SECOND CLAIM FOR RELIEF**

**14th Amendment Procedural Due Process Violations**

**(Plaintiff Estate of Kenneth Hass against Defendants Walker, Jamieson, Matteucci, Peykanu, Bell, Christianson, Bowers, Ranganathan, Gundroo, Muppaneni, Chotalia, Hiester, Darami, Cockroft, Adenekan, Kamandi, Ortega, Okeke, & John Does 1-15)**

396.   Plaintiffs reallege and incorporate by reference all preceding paragraphs.

397.   Plaintiff was a mental health patient whose competency had been challenged and against whom preliminary findings made that he suffered from a mental disease or defect which affected his ability to care for himself or made him a danger. This created a higher degree of duty owed by the Individual Defendants to Mr. Hass.

Page 81 of 114 – COMPLAINT

398.    Mr. Hass was entitled to a full range of due process protections to protect his fundamental rights, including a right to notice, right to be heard, right to call witness, right to be fully informed of all actions, right to consent or not consent to treatment, right to seek outside review of actions by the Individual Defendants, right to timely adjudication of certain rights, and right to a fair and just process.

399.    Mr. Hass should have had a legal guardian appointed to protect him in his vital due process decisions and processes. Mr. Hass could not voluntarily consent to being held for an aid and assist evaluation, could not consent to a civil commitment, could not consent to forced medication, and could not voluntarily waive any of his protected due process rights. Mr. Hass had the right to counsel in each of the adjudication efforts made by the Oregon State Hospital and the right to a full adjudicated hearing on these vital rights that were being compromised by the Individual Defendants. Furthermore, the Individual Defendants had a duty to Mr. Hass to ensure and guarantee his rights were fully protected because of the nature of their relationship with him.

400.    As a result of the intentional acts of the Individual Defendants to strip Mr. Hass of his fundamental entitlement to due process Mr. Hass was held substantially longer than legally authorized, was forced to submit to civil commitment and held beyond statutory limits, was denied access to his files, a lawyer and the appointment of a guardian whose main interest was in his well-being. Mr. Hass languished in a purgatory of holding while the Individual Defendants delayed an aid and assist evaluation, failed to conduct a timely or adequate evaluation, defaulted to civil commitment when all other efforts failed, forced Mr. Hass into a seclusion and isolation under heavy forced medication without court review or intervention and without the authority provided by a legal guardian or review by a court.

401.    The Individual Defendants, after denying Mr. Hass his guaranteed rights under the 14th Amendment in virtually all aspects of those rights, simply determined Mr. Hass was going to die from his mental disease that they failed to treat. They denied Mr. Hass's sister access to visit him and even after her appointment as legal guardian they refused to follow her directions.

402.    The Individual Defendants simply did what they wanted and ignored legal barriers and restrictions; making them a law unto themselves.

403.    As a result of the Individual Defendants' conduct, Mr. Hass suffered in the many ways described above.

### THIRD CLAIM FOR RELIEF

### 14th Amendment Substantive Due Process—Loss of Life

**(Plaintiff Estate of Kenneth Hass against Defendants Walker, Jamieson, Matteucci, Peykanu, Bell, Christianson, Bowers, Ranganathan, Gundroo, Muppaneni, Chotalia, Hiester, Darami, Cockroft, Adenekan, Kamandi, Ortega, Okeke, & John Does 1-15)**

404.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

405.    Mr. Hass had constitutionally-protected "fundamental rights" including his life and liberty pursuant to the substantive due process clause of the 14th Amendment to the United States Constitution. Defendants can be held liable for their actions and inactions which cause a deprivation of life or liberty.

406.    The Individual Defendants were deliberately indifferent to the rights held by Mr. Hass. The conduct by the Individual Defendants shocks the conscience given the significant opportunities to do the right thing coupled with the refusal to do so. At all material times they were acting under the color of law.

407.    The Individual Defendants failed in every aspect of their treatment of Mr. Hass as previously alleged. They ignored obvious signs of deterioration without any adjustment to their

course of treatment, intentionally allowed Mr. Hass's care to deteriorate, and ignored the negative and obvious signs of deterioration and loss.

408. The Individual Defendants knew Mr. Hass was a high fall risk, suffered from a serious medical condition and had been showing increased symptoms indicative of a complete failure in their treatment of his mental health condition. The Individual Defendants simply locked Mr. Hass in isolation without thought to consequence or seeking an alternative treatment plan. This violated the constitutional mandates imposed on them and is in complete violation of the law and any acceptable medical standard of care.

409. Most of the treatment administered to Mr. Hass and the treatment withheld is documented in the CMS Report noting serious, significant and life threatening treatment by the Individual Defendants. Overuse of isolation can and did cause serious mental health concerns and death. Overmedication and incorrect medication can and did cause increased psychosis and a significant body deterioration. Extensive reliance on four-point restraint can and did result in bedsores, infection, and sepsis. The treatment and care by the Individual Defendants was barbaric and not accepted in civilized society.

410. The Individual Defendants' conduct was a long, uninterrupted course of action designed to punish, harm, and isolate Mr. Hass. The repeated and combined failures by the Individual Defendants in the treatment of Mr. Hass resulted in his death when he was isolated in a filthy cell, not allowed to use the bathroom, not treated for his mental health condition in a safe manner, denied intervention by observing staff to protect Mr. Hass from falls, and then the expected fall and death resulted. His death could have been prevented at many different times during Mr. Hass's lengthy hospitalization.

411. As a result of the Individual Defendants' conduct, Mr. Hass suffered in the many ways described above.

**FOURTH CLAIM FOR RELIEF**

**14th Amendment Substantive Due Process—Failure to Supervise**

**(Plaintiff Estate of Kenneth Hass against Defendants Hathi, Walker, Jamieson, Matteucci, Peykanu, and Bell)**

412.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

413.    Individual supervisors are liable for constitutional violations due to their own culpable action or inactions either through their own direct participation in the violations, a failure to train, supervise or control subordinates, their own acquiescence in the constitutional deprivation, failure to remedy a wrong after learning of the violation, creating a custom, practice or policy to continue or other conduct which shows a reckless or callous indifference to the Constitutional rights of others.

414.    Defendants Hathi, Walker, Jamieson, Matteucci, Peykanu, and Bell ("Individual Supervisory Defendants") violated Mr. Hass's protected constitutional rights.

415.    Defendant Bell violated Mr. Hass's protected constitutional rights to liberty and life over the course of three years in a continuous uninterrupted course of actions by:

a.    Failing to reach or achieve a viable differential diagnosis upon which a treatment plan could be developed;

b.    Failing to follow recommendations and treatment plans by experts and other professionals;

c.    Failing to supervise subordinate staff in monitoring Mr. Hass;

d.    Failing to actually examine Mr. Hass prior to ongoing orders;

e.    Failing to observe subordinate staff who were interacting with Mr. Hass;

f.    Failing to investigate claims made by subordinate staff about care for Mr. Hass;

g.     Failing to make adjustments to medications and treatment after receipt of information suggestive of a need for change;

h.     Creating a special private plan for Mr. Hass with little or no medical or psychological import; and

i.     Acquiescing in the treatment by other staff members on Mr. Hass and refusal to adjust to correct inhumane conditions.

416.    Defendant Walker violated Mr. Hass's protected constitutional rights to liberty and life over the course of three years in a continuous uninterrupted course of actions in the following non-exhaustive ways:

a.     Failing to evaluate complaints made by Mr. Hass about his care and treatment thereafter ignoring future complaints;

b.     Failing to initiate investigation into the extraordinary use of seclusion and restraints on Mr. Hass;

c.     Failing to adequately respond to complaints about Mr. Hass's care from treatment providers including her own Chief of Nursing;

d.     Failing to do an adequate chart review of Mr. Hass's care by her subordinate staff and ascertain the appropriateness of care given to Mr. Hass including:

    i.      Failing to reach a differential diagnosis;

    ii.     Administering inordinately high use of medications often overlapping and countering each other;

    iii.    Failing to limit the use of seclusion and restraint on Mr. Hass;

    iv.     Failing to investigate increased symptomology manifest by Mr. Hass;

      v.       Failing to investigate repeated medical failures resulting in Mr. Hass's admissions to the emergency department at Salem Hospital; and

      vi.     Failing to investigate and mitigate ongoing falls and fall risk of Mr. Hass, including review and modification of medication causing the falls;

e.     Failing to investigate and adjust Mr. Hass's confinement to unsanitary and unsafe isolation rooms;

f.     Failing to provide Mr. Hass timely and adequate evaluations including those for an Aid and Assist evaluation;

g.     Failing to investigate the appointment of a legal guardian for Mr. Hass;

h.     Failing to investigate and adjust any treatment plan for Mr. Hass;

i.     Failing to investigate and adjust any failures in diagnosis and treatment identified by consulting psychologist and psychiatrist;

j.     Failing to investigate and adjust failures to obtain approval for ECT and psychological interventions;

k.     Failing to provide training in Mr. Hass's medical care including his fall risk and the dangers from consuming too much water;

l.     Failing to provide training on emergency responses to medical emergencies including conduct Code Blue simulations and additional training; and

m.     Failing to ensure subordinate staff had ongoing certification in emergency response and emergency CPR training and the use of a crash care, defibrillation, and timely response to trauma.

417.   Defendant Peykanu violated Mr. Hass's protected constitutional rights to liberty and life over the course of three years in a continuous uninterrupted course of actions in a non-exhaustive list:

a.   Failing to provide timely and medically adequate diagnosis and to create a treatment plan to assist Mr. Hass restore his mental abilities;

b.   Failing to timely review Mr. Hass's medications and adjust as needed;

c.   Failing to ascertain what medications, if any, were required based on a scientific diagnosis;

d.   Failing to secure information and background from Mr. Hass's family members;

e.   Failing to timely seek a legal guardian to provide guidance on treatment and to seek approval for treatment;

f.   Failing to adequately document a significant amount of treatment for Mr. Hass;

g.   Failing to adequately inform Mr. Hass or his legal guardian of recommended changes in treatment or medication;

h.   Failing to follow instructions by Mr. Hass's legal guardian, Ms. Hass, on medications and treatment;

i.   Providing false information about Mr. Hass's treatment to Ms. Hass;

j.   Refusing to allow Ms. Hass to visit and witness treatment provided to Mr. Hass;

k.   Failing to adequately observe Mr. Hass and note behavior changes;

l.   Failing to consult with outside experts for further insight on Mr. Hass's behavior changes;

m.   Failing to seek adequate legal authority prior to civil commitment;

n.   Failing to seek adequate legal authority prior to forcible medication;

o.   Failing to seek adequate legal authority prior to providing treatment that was well outside acceptable standard of care;

p.   Failing to stop harmful and abusive medical care and treatment;

q.   Ignoring insights and recommendations of experts;

r.   Failing to provide adequate management and supervision to protect Mr. Hass from aberrant behavior and reduce his risk of fall;

s.   Failing to provide protections for Mr. Hass's medical condition, which resulted in falls, dangerous drinking and combative behavior;

t.   Failing to seek timely and adequate medical treatment when Mr. Hass developed bedsores from his extended four-point restraint and isolation;

u.   Failing to provide care or prevention for falls;

v.   Failing to provide timely emergency treatment;

w.   Using isolation and restraint in violation of law, existing standards of care and in a depraved manner simply because providing actual treatment for Mr. Hass was more work;

x.   Ignoring changes in Mr. Hass's behavior or response to medications including increased psychosis, increased falling, increased combativeness, increased delusion and proceeded forward despite repeated opportunities to change treatment, reduce medications, and limit isolation;

y.   Keeping Mr. Hass in a dirty, unsanitary room covered in feces and urine which subjected Mr. Hass to additional medical problems;

z.     Instructing Oregon State Hospital staff not to intervene with Mr. Hass if he should fall or should engage in self-destructive behavior while in the isolation cell; and

aa.     Ignoring concerns repeatedly expressed to him by Oregon State Hospital staff.

418.    Defendant Matteucci violated Mr. Hass's protected constitutional rights to liberty and life over the course of three years in a continuous uninterrupted course of action in the following non-exhaustive manner:

a.     Failing to evaluate complaints made by Mr. Hass about his care and treatment thereafter ignoring future complaints;

b.     Failing to initiate investigation into the extraordinary use of seclusion and restraints on Mr. Hass;

c.     Failing to adequately respond to complaints about Mr. Hass's care from treatment providers;

d.     Failing to do an adequate chart review of Mr. Hass's care by her subordinate staff and ascertain the appropriateness of care given to Mr. Hass including:

      i.     Failing to reach a differential diagnosis;

      ii.     Administering inordinately high use of medications often overlapping and countering each other,

      iii.     Failing to limit the use of seclusion and restraint on Mr. Hass;

      iv.     Failing to investigate increased symptomology manifest by Mr. Hass;

v.     Failing to investigate repeated medical failures resulting in Mr. Hass's admissions to the emergency department at Salem Hospital; and

vi.     Failing to investigate and mitigate ongoing falls and fall risk of Mr. Hass including review and modification of medication causing the falls.

e.     Failing to investigate and adjust Mr. Hass's confinement to unsanitary and unsafe isolation rooms;

f.     Failing to provide Mr. Hass timely and adequate evaluations including those for an Aid and Assist evaluation;

g.     Failing to investigate the appointment of a legal guardian for Mr. Hass;

h.     Failing to investigate and adjust any treatment plan for Mr. Hass;

i.     Failing to investigate and adjust any failures in diagnosis and treatment identified by consulting psychologist and psychiatrist;

j.     Failing to investigate and adjust failures to obtain approval for ECT and psychological interventions;

k.     Failing to provide training in Mr. Hass's medical care including his fall risk and the dangers from consuming too much water;

l.     Failing to provide training on emergency responses to medical emergencies including conduct Code Blue simulations and additional training; and

m.     Failing to ensure subordinate staff had ongoing certification in emergency response and emergency CPR training and the use of a crash care, defibrillation, and timely response to trauma.

419. Defendant Hathi violated Mr. Hass's protected constitutional rights to liberty and life over the course of three years in a continuous uninterrupted course of action in the following non-exhaustive manner:

  a. Failing to investigate failures identified in CMS audits and reports of the Oregon State Hospital;

  b. Failing to implement adequate training and re-training for subordinate staff at the Oregon State Hospital in emergency response, use of restraint, and seclusion;

  c. Failing to supervise any of the management staff at the Oregon State Hospital for the updating of policies, training, and procedures including in those areas which were identified in the 2023, 2024, and 2025 CMS audits and evaluations; and

  d. Failing to evaluate and update specific policies of the Oregon State Hospital to comply with state and federal law imposed on mental health facilities.

420. Defendant Jamieson violated Mr. Hass's protected Constitutional rights to liberty and life over the course of three years in a continuous uninterrupted course of action in the following non-exhaustive manner:

  a. Failing to commit to public funds for adequate housing, care and treatment for Mr. Hass including overtime for monitoring of Hass while in isolation;

  b. Failing to report the abuses and substandard treatment of Mr. Hass to the proper authorities; and

  c. Failing to make any attempt to protect Mr. Hass from the ongoing reported abuses and substandard treatment.

**FIFTH CLAIM FOR RELIEF**

**Negligence/Recklessness**

**(Plaintiff Estate of Kenneth Hass against Defendant State of Oregon)**

**Count 1 – By and Through Its Oregon Health Authority**

421.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

422.    At all times material hereto, Defendant State of Oregon, by and through its Oregon Health Authority, owed a duty to the Plaintiffs to safely, effectively, and lawfully operate the Oregon State Hospital.

423.    At all times material hereto, Defendants Hathi, Walker, Matteucci & John Does 1-15 were employees and/or agents of Defendant State of Oregon and were acting in the course and scope of their employment and/or agency for Defendant State of Oregon. Therefore, Defendant State of Oregon is vicariously liable for all acts and/or omissions committed by Defendants Hathi, Walker, Matteucci & John Does 1-15 while they were acting in the course and scope of their employment and/or agency.

424.    Defendant State of Oregon was negligent, reckless, or some combination thereof in one or more of the following particulars:

      a.    Failing to ensure that the Oregon State Hospital operated in compliance with federal conditions of participation;

      b.    Failing to ensure the implementation of policies, procedures, and training necessary to protect patient safety;

      c.    Failing to ensure that corrective actions were taken following prior CMS findings of deficiency;

      d.    Failing to ensure that corrective actions were taken following complaints by Oregon State Hospital Staff regarding the treatment of Mr. Hass;

e.    Failing to ensure that corrective actions were taken following Mr. Hass's complaints about his treatment;

f.    Permitting continued operation of the Oregon State Hospital despite known and repeated failures in patient monitoring, patient treatment, emergency response, seclusion practices, and nursing oversight; and

g.    Failing to properly hire, instruct, train, retain, and supervise its employees.

425.    Defendant State of Oregon was reckless because it intentionally acted or failed to act when it knew or had reason to know of facts that would lead a reasonable person to realize that its conduct not only creates unreasonable risk of harm to others but also involves a high degree of probability that substantial harm would result.

426.    Defendant State of Oregon's breach of its duties created a foreseeable risk of harm to Mr. Hass.

427.    As a result of the conduct of Defendant State of Oregon, Plaintiff Estate of Kenneth Hass suffered damages as described above.

428.    Plaintiff Estate of Kenneth Hass brings this claim pursuant to ORS 30.020.

**Count 2 – By and Through the Oregon State Hospital**

429.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

430.    At all times material hereto, Defendants Walker, Peykanu, Bell, Bowers, Christianson, Ranganathan, Gundroo, Muppaneni, Chotalia, Hiester, Cockroft, Adenakan, Darami, Kamandi, Okeke, Ortega, & John Does 1-15 were employees and/or agents of Defendant State of Oregon and were acting in the course and scope of their employment and/or agency for Defendant State of Oregon. Therefore, Defendant State of Oregon is vicariously liable for all acts and/or omissions committed by Defendants Walker, Peykanu, Bell, Bowers, Christianson, Ranganathan, Gundroo, Muppaneni, Chotalia, Hiester, Cockroft, Adenakan,

Darami, Kamandi, Okeke, Ortega, & John Does 1-15 while they were acting in the course and scope of their employment and/or agency.

431.   At all times material hereto, Defendant State of Oregon, by and through the Oregon State Hospital, owed a duty of care to Mr. Hass to protect him and keep him safe. The relationship between all individuals at the Oregon State Hospital and Mr. Hass was a "special relationship" creating a higher duty of care and diligence by the individuals. The failure to adhere to the law and existing standards of care by Defendant State of Oregon foreseeably led to the losses suffered by Mr. Hass, his deterioration, and eventually his preventable death.

432.   Defendant State of Oregon was negligent, reckless, or some combination thereof in one or more of the following particulars:

    a.   Failing to provide a system capable of delivering safe and adequate psychiatric and medical care;

    b.   Failing to implement policies, procedures, and training to ensure continuous monitoring of patients in seclusion;

    c.   Failing to implement policies, procedures, and training to ensure effective treatment planning;

    d.   Failing to implement policies, procedures, and training to ensure its medical professionals would in fact provide effective medical treatment to their patients;

    e.   Failing to maintain an effective program to measure quality of treatment and improve its performance;

    f.   Creating and maintaining a system in which prolonged seclusion was used as a substitute for treatment;

g. Creating, maintaining, and permitting a culture in which staff relied on behavioral assumptions rather than clinical assessment;

h. Failing to ensure that corrective actions were taken following prior CMS findings of deficiency;

i. Failing to correct known risks identified in prior CMS investigations, despite clear notice of patient safety failures;

j. Failing to ensure that corrective actions were taken following complaints by its own employees regarding the treatment of Mr. Hass;

k. Failing to ensure that corrective actions were taken following Mr. Hass's complaints about his treatment;

l. Failing to ensure that psychiatrists and advanced practice providers were conducting clinical assessments of Mr. Hass;

m. Failing to ensure that psychiatric providers' documentation and clinical decision-making were consistent with accepted standards of care;

n. Failing to seek expert consultation despite obvious signs that treatment was failing Mr. Hass and likely making him worse;

o. Failing to ensure that nursing staff were adequately trained and competent in seclusion monitoring;

p. Failing to ensure that nursing staff were adequately trained and competent in fall response;

q. Failing to ensure that nursing staff were adequately trained and competent in emergency intervention;

r. Failing to ensure that nursing staff responded appropriately to reports of medical events;

s.      Failing to correct patterns of deficient nursing practice, including failure to monitor, failure to reassess patients, reliance on behavioral assumptions, and failure to initiate emergency response; and

t.      Failing to properly hire, instruct, train, retain, and supervise its employees.

433.    Defendant State of Oregon was reckless because it intentionally acted or failed to act when it knew or had reason to know of facts that would lead a reasonable person to realize that its conduct not only creates unreasonable risk of harm to others but also involves a high degree of probability that substantial harm would result.

434.    Defendant State of Oregon's breach of its duties created a foreseeable risk of harm to Mr. Hass.

435.    As a result of the conduct of Defendant State of Oregon, Plaintiff Estate of Kenneth Hass suffered damages as described above.

436.    Plaintiff Estate of Kenneth Hass brings this claim pursuant to ORS 30.020.

**Count 3 – By and Through Its Physicians**

437.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

438.    Defendant State of Oregon was negligent, reckless, or some combination thereof in one or more of the following particulars:

a.      Failing to adequately assess Mr. Hass's medical condition;

b.      Failing to adequately treat Mr. Hass's medical condition;

c.      Failing to adequately assess Mr. Hass's psychiatric condition;

d.      Failing to adequately treat Mr. Hass's medical condition;

e.      Failing to perform a meaningful assessment due to prior behavioral concerns;

f.      Failing to seek expert consultation despite obvious signs that treatment was failing Mr. Hass and likely making him worse.

g.      Maintaining Mr. Hass's seclusion orders despite documentation indicating he was asleep or non-agitated;

h.      Maintaining Mr. Hass's seclusion orders despite documentation indicating that the criteria for continued seclusion were not clinically justified;

i.      Authorizing environmental changes without structured safety protocols, interdisciplinary coordination, or defined monitoring criteria;

j.      Failing to ensure that nursing staff had clear guidance regarding when and how to modify an intervention;

k.      Failing to ensure that nursing staff had clear guidance regarding when and how to terminate an intervention;

l.      Failing to ensure that Mr. Hass's treatment plan addressed his severe psychosis;

m.      Failing to ensure that Mr. Hass's treatment plan addressed his fall risk; and

n.      Failing to ensure that Mr. Hass's treatment plan addressed his polydipsia.

439.    Defendant State of Oregon was reckless because it intentionally acted or failed to act when it knew or had reason to know of facts that would lead a reasonable person to realize that its conduct not only creates unreasonable risk of harm to others but also involves a high degree of probability that substantial harm would result.

440.    Defendant State of Oregon's breach of its duties created a foreseeable risk of harm to Mr. Hass.

441.    As a result of the conduct of Defendant State of Oregon, Plaintiff Estate of Kenneth Hass suffered damages as described above.

442.    Plaintiff Estate of Kenneth Hass brings this claim pursuant to ORS 30.020.

**Count 4 – By and Through Its Nurses, Medical Assistants, and Technicians**

443.    Plaintiff Estate of Kenneth Hass realleges and incorporates by reference all preceding paragraphs.

444.    Defendant State of Oregon was negligent, reckless, or some combination thereof in one or more of the following particulars:

a.      Failing to adequately reassess Mr. Hass's medical condition;

b.      Failing to adequately monitor Mr. Hass's medical condition;

c.      Failing to adequately respond to medical emergencies suffered by Mr. Hass while under its care;

d.      Failing to adequately document Mr. Hass's condition, such as documenting Mr. Hass's condition as aggressive while simultaneously documenting that he was sleeping or inactive;

e.      Failing to implement appropriate interventions for polydipsia;

f.      Failing to implement appropriate interventions for unsafe environmental behaviors;

g.      Failing to perform adequate reassessments following clinical changes;

h.      Failing to monitor Mr. Hass;

i.      Failing to report unsafe environmental behaviors;

j.      Failing to report injuries;

k.      Failing to report medical emergencies;

l.      Failing to respond to reported injuries;

m.  Failing to respond to reported medical emergencies;

n.  Failing to adequately respond to medical emergencies based on behavioral assumptions, including the belief that Mr. Hass was "playing possum;" and

o.  Failing to properly resuscitate Mr. Hass.

445.  Defendant State of Oregon was reckless because it intentionally acted or failed to act when it knew or had reason to know of facts that would lead a reasonable person to realize that its conduct not only creates unreasonable risk of harm to others but also involves a high degree of probability that substantial harm would result.

446.  Defendant State of Oregon's breach of its duties created a foreseeable risk of harm to Mr. Hass.

447.  As a result of the conduct of Defendant State of Oregon, Plaintiff Estate of Kenneth Hass suffered damages as described above.

448.  Plaintiff Estate of Kenneth Hass brings this claim pursuant to ORS 30.020.

### SIXTH CLAIM FOR RELIEF

### Physical Abuse against a Vulnerable Person (ORS 124.100 *et seq.*)

### (Plaintiff Estate of Kenneth Hass against Defendant State of Oregon)

### Count 1 – Reckless Endangerment and Criminal Mistreatment in Violation of ORS 124.105(1)(c) and (d)

449.  Plaintiffs reallege and incorporate by reference all preceding paragraphs.

450.  At all times relevant, Mr. Hass was a vulnerable person pursuant to ORS 124.100(1)(e)(B)-(D) and therefore a member of the class of persons intended to be protected by the Elderly Persons and Persons With Disabilities Abuse Prevention Act, ORS 124.100 *et seq.*

451.  At all times material hereto, Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, Okeke, and John Does 1-15 were employees and/or

agents of Defendant State of Oregon and were acting in the course and scope of their employment and/or agency for Defendant State of Oregon. Therefore, Defendant State of Oregon is vicariously liable for all acts and/or omissions committed by Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, Okeke, and John Does 1-15 while they were acting in the course and scope of their employment and/or agency.

452.    Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, Okeke, and John Does 1-15 recklessly engaged in conduct that created a substantial risk of serious physical injury to Mr. Hass.

453.    These acts and omissions of Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, Okeke, and John Does 1-15 constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) by engaging in conduct that would constitute Recklessly Endangering Another Person pursuant to ORS 124.105(1)(d) and ORS 163.195.

454.    Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke had a legal duty to provide care for Mr. Hass.

455.    Additionally and in the alternative, Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke assumed the temporary care, custody or responsibility for the supervision of Mr. Hass.

456.    While they had a legal duty to provide care for Mr. Hass, Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke, with criminal negligence, withheld necessary and adequate physical care and medical attention from Mr. Hass.

457.    These acts and omissions of Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke constitute physical abuse of a vulnerable

person pursuant to ORS 124.100(2) and (4) by engaging in conduct that would constitute Criminal Mistreatment in the Second Degree pursuant to ORS 124.105(1)(d) and ORS 163.200.

458.    Additionally and in the alternative, Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke knowingly or intentionally withheld necessary and adequate physical care and medical attention from Mr. Hass.

459.    These acts and omissions of Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) by engaging in conduct that constitutes Criminal Mistreatment in the First Degree pursuant to ORS 124.105(1)(d) and ORS 163.205.

460.    As a result of Defendant State of Oregon's violations of ORS 124.100(2) and (4), Mr. Hass suffered injuries and damages as set forth above. The injuries and damages suffered by Mr. Hass are the type that ORS 124.100 *et seq*. were intended to prevent.

461.    Plaintiff Estate of Kenneth Hass is entitled to treble damages pursuant to ORS 124.100(2)(a) and (b).

462.    Plaintiff Estate of Kenneth Hass has incurred and will incur attorneys' fees in the prosecution of this action and is therefore entitled to its reasonable attorney fees pursuant to ORS 124.100(2)(c).

463.    Plaintiff Estate of Kenneth Hass has incurred and will incur fees for the services of a personal representative in order to prosecute its claim and is therefore entitled to its reasonable fees pursuant to ORS 124.100(2)(d).

### Count 2 – Unreasonable Physical Restraint in Violation of ORS 124.105(2)

464.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

465. At all times relevant, Mr. Hass was a vulnerable person pursuant to ORS 124.100(1)(e)(B)-(D) and therefore a member of the class of persons intended to be protected by the Elderly Persons and Persons With Disabilities Abuse Prevention Act, ORS 124.100 *et seq.*

466. At all times material hereto, Defendants Peykanu, Bowers, Christianson, Hiester, Ranganathan, Gundroo, and John Does 1-15 were employees and/or agents of Defendant State of Oregon and were acting in the course and scope of their employment/agency for Defendant State of Oregon. Therefore, Defendant State of Oregon is vicariously liable for all acts and/or omissions committed by Defendants Peykanu, Bowers, Christianson, Hiester, Ranganathan, Gundroo, and John Does 1-15 while they were acting in the course and scope of their employment/agency.

467. Defendants Peykanu, Bowers, Christianson, Hiester, Ranganathan, Gundroo, and John Does 1-15 used unreasonable physical constraint on Mr. Hass.

468. These acts of Defendants Peykanu, Bowers, Christianson, Hiester, Ranganathan, Gundroo, and John Does 1-15 constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) because they used unreasonable physical restraint on a vulnerable person pursuant to ORS 124.105(2).

469. As a result of Defendant State of Oregon's violations of ORS 124.100(2) and (4), Mr. Hass suffered injuries and damages as set forth above. The injuries and damages suffered by Mr. Hass are the type that ORS 124.100 *et seq.* were intended to prevent.

470. Plaintiff Estate of Kenneth Hass is entitled to treble damages pursuant to ORS 124.100(2)(a) and (b).

471. Plaintiff Estate of Kenneth Hass has incurred and will incur attorneys' fees in the prosecution of this action and is therefore entitled to its reasonable attorney fees pursuant to ORS 124.100(2)(c).

472.    Plaintiff Estate of Kenneth Hass has incurred and will incur fees for the services of a personal representative in order to prosecute its claim and is therefore entitled to its reasonable fees pursuant to ORS 124.100(2)(d).

**Count 3 – Physical Restraint for the Purpose of Punishment in Violation of ORS 124.105(3)(a)**

473.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

474.    At all times relevant, Mr. Hass was a vulnerable person pursuant to ORS 124.100(1)(e)(B)-(D) and therefore a member of the class of persons intended to be protected by the Elderly Persons and Persons With Disabilities Abuse Prevention Act, ORS 124.100 *et seq.*

475.    At all times material hereto, Defendant Peykanu was an employee and/or agent of State of Oregon and was acting in the course and scope of his employment and/or agency for Defendant State of Oregon. Therefore, Defendant State of Oregon is vicariously liable for all acts and/or omissions committed by Defendant Peykanu while he was acting in the course and scope of his employment and/or agency.

476.    Defendant Peykanu used physical restraint on Kenneth Hass for the purpose of punishing him.

477.    These acts of Defendant Peykanu constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) because he used physical restraint for the purpose of punishing a vulnerable person pursuant to ORS 124.105(3)(a).

478.    As a result of Defendant State of Oregon's violations of ORS 124.100(2) and (4), Mr. Hass suffered injuries and damages as set forth above. The injuries and damages suffered by Mr. Hass are the type that ORS 124.100 *et seq.* were intended to prevent.

479.    Plaintiff Estate of Kenneth Hass is entitled to treble damages pursuant to ORS 124.100(2)(a) and (b).

480.    Plaintiff Estate of Kenneth Hass has incurred and will incur attorneys' fees in the prosecution of this action and is therefore entitled to its reasonable attorney fees pursuant to ORS 124.100(2)(c).

481.    Plaintiff Estate of Kenneth Hass has incurred and will incur fees for the services of a personal representative in order to prosecute its claim and is therefore entitled to its reasonable fees pursuant to ORS 124.100(2)(d).

### Count 4 – Permitting Another Person to Engage in Physical Abuse in Violation of ORS 124.100(2) and (4)

482.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

483.    At all times relevant, Mr. Hass was a vulnerable person pursuant to ORS 124.100(1)(e)(B)-(D) and therefore a member of the class of persons intended to be protected by the Elderly Persons and Persons With Disabilities Abuse Prevention Act, ORS 124.100 *et seq.*

484.    The acts and omissions of Defendant State of Oregon constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) by permitting Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke to engage in conduct that would constitute Recklessly Endangering Another Person pursuant to ORS 124.105(1)(c) and ORS 163.195 when Defendant State of Oregon knowingly acted or failed to act under circumstances in which a reasonable person should have known of the physical abuse.

485.    Additionally and in the alternative, the acts and omissions of Defendant State of Oregon constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) by permitting Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke to engage in conduct that would constitute Criminal Mistreatment in the Second Degree pursuant to ORS 124.105(1)(d) and ORS 163.200 when Defendant State of

Oregon knowingly acted or failed to act under circumstances in which a reasonable person should have known of the physical abuse.

486.    Additionally and in the alternative, the acts and omissions of Defendant State of Oregon constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) by permitting Defendants Walker, Peykanu, Bell, Bowers, Christianson, Cockroft, Adenakan, Darami, and Okeke to engage in conduct that would constitute Criminal Mistreatment in the First Degree pursuant to ORS 124.105(1)(d) and ORS 163.205 when Defendant State of Oregon, knowingly acted or failed to act under circumstances in which a reasonable person should have known of the physical abuse.

487.    Additionally and in the alternative, the acts and omissions of Defendant State of Oregon constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) by permitting Defendants Peykanu, Bowers, Christianson, Hiester, Ranganathan, Gundroo, and John Does 1-15 to use unreasonable physical restraint on a vulnerable person pursuant to ORS 124.105(2) when Defendant State of Oregon knowingly acted or failed to act under circumstances in which a reasonable person should have known of the physical abuse.

488.    Additionally and in the alternative, the acts and omissions of Defendant State of Oregon constitute physical abuse of a vulnerable person pursuant to ORS 124.100(2) and (4) by permitting Defendant Peykanu to use physical restraint on a vulnerable person for the purpose of punishing the vulnerable person pursuant to ORS 124.105(3) when Defendant State of Oregon knowingly acted or failed to act under circumstances in which a reasonable person should have known of the physical abuse.

489.    As a result of Defendant State of Oregon's violations of ORS 124.100(2) and (4), Mr. Hass suffered injuries and damages as set forth above. The injuries and damages suffered by Mr. Hass are the type that ORS 124.100 *et seq*. were intended to prevent.

Page 106 of 114 – COMPLAINT

490.    Plaintiff Estate of Kenneth Hass is entitled to treble damages pursuant to ORS 124.100(2)(a) and (b).

491.    Plaintiff Estate of Kenneth Hass has incurred and will incur attorneys' fees in the prosecution of this action and is therefore entitled to its reasonable attorney fees pursuant to ORS 124.100(2)(c).

492.    Plaintiff Estate of Kenneth Hass has incurred and will incur fees for the services of a personal representative in order to prosecute its claim and is therefore entitled to its reasonable fees pursuant to ORS 124.100(2)(d).

## SEVENTH CLAIM FOR RELIEF

### Fraud

**(Plaintiff Sierra Hass against Defendant State of Oregon)**

493.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

494.    At all times material hereto, Defendant Peykanu was an employee and/or agent of Defendant State of Oregon and was acting in the course and scope of his employment/agency for Defendant State of Oregon. Therefore, Defendant State of Oregon is vicariously liable for all acts and/or omissions committed by Defendant Peykanu while he was acting in the course and scope of his employment and/or agency.

495.    Defendant Peykanu falsely represented to Plaintiff Sierra Hass that he would cease all of Mr. Hass's medications.

496.    Defendant Peykanu falsely represented to Plaintiff Sierra Hass that Mr. Hass could not be removed from the Oregon State Hospital without Defendant Peykanu's authorization.

497.    Defendant Peykanu falsely represented to Plaintiff Sierra Hass that Mr. Hass's psychiatric treatment was within the standard of care.

Page 107 of 114 – COMPLAINT

498.    Defendant Peykanu falsely represented to Plaintiff Sierra Hass that Mr. Hass's medication regimen was within the standard of care.

499.    Defendant Peykanu knew that the above representations were false and/or recklessly made these representations without knowing if they were true or false.

500.    Defendant Peykanu's knowledge that he would not cease Mr. Hass's medication regimen, that he did not have authority to force Mr. Hass to stay at the Oregon State Hospital over his legal guardian's objections, that Mr. Hass was not receiving psychiatric treatment within the standard of care, and that Mr. Hass's medication regimen was not within the standard of care each constituted material facts. Had Plaintiff Sierra Hass been aware of such facts, Plaintiff Sierra Hass would not have allowed the Oregon State Hospital to continue to treat Mr. Hass.

501.    Defendant Peykanu intended to mislead Plaintiff Sierra Hass, knew that he was misleading Plaintiff Sierra Hass, and/or recklessly disregarded whether he was misleading Plaintiff Sierra Hass.

502.    Plaintiff Sierra Hass justifiably and reasonably relied on Defendant Peykanu's representation.

503.    Defendant Peykanu's conduct created a foreseeable risk of harm to Plaintiff Sierra Hass.

504.    As a result of Defendant Peykanu's conduct, Plaintiff Sierra Hass suffered damages as described above.

### EIGHTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress

### (Plaintiff Sierra Hass against Defendant State of Oregon)

505.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

506.    At all times material hereto, Defendants Walker, Peykanu, Bell, Bowers, Hathi, Christianson, and Cockroft were employees and/or agents of Defendant State of Oregon and were acting in the course and scope of their employment and/or agency for Defendant State of Oregon. Therefore, Defendant State of Oregon is vicariously liable for all acts and/or omissions committed by Defendants Walker, Peykanu, Bell, Bowers, Hathi, Christianson, and Cockroft while they were acting in the course and scope of their employment and/or agency.

507.    As described above, Defendant State of Oregon's negligent and or/reckless conduct caused the decompensation, humiliation, and neglect of Mr. Hass.

508.    Plaintiff Sierra Hass had a legally protected interest in not witnessing the decompensation, humiliation, and neglect of a close family member, her brother Kenneth Hass.

509.    In witnessing her brother's condition in December 2024 and January 2025, Plaintiff Sierra Hass's legally protected interested was violated.

510.    Defendant State of Oregon's breach of its duties created a foreseeable risk of harm to Plaintiff Sierra Hass.

511.    Defendant State of Oregon was reckless because it knew or had reason to know of facts that would lead a reasonable person to realize that its conduct not only creates unreasonable risk of harm to others but also involves a high degree of probability that substantial harm would result.

512.    As a result of Defendant State of Oregon's conduct, Plaintiff Sierra Hass suffered damages as described above.

## NINTH CLAIM FOR RELIEF

### Injunctive/Declaratory Relief Under 42 U.S.C. § 1983

**(Plaintiffs against Defendant State of Oregon)**

513.    Plaintiffs reallege all previous paragraphs as if more fully set forth herein.

514.    The State of Oregon through its Oregon Health Authority and the Oregon State Hospital have a long and tortured history of patient abuses, mistreatment, and systemic failures to provide safe, sanitary care that meets all existing standards for medical and psychiatric care.

515.    The Oregon State Hospital has been the target and subject of numerous lawsuits, court orders, outside peer review, audits by government agencies and has failed at most every juncture to comply with the law or to provide safe and humane conditions for those patients who are committed to its care.

516.    Chief Bromden in *One Flew Over the Cuckoo's Nest* called the Oregon State Hospital "The Combine", a factory-like system designed to strip away patients' individuality and turn them into compliant, emasculated beings. The Oregon State Hospital performed exactly in the same way to Kenneth Hass and it killed him in the end.

517.    Mr. Hass is not the first Oregon State Hospital patient to suffer from neglect, overmedication, extreme isolation, and techniques that "shock the conscience," especially when applied to mentally ill vulnerable patients. The various audits, reviews, and lawsuits reveal several "unexplained" deaths occur at the Oregon State Hospital and extreme treatment is used in a dangerous manner.

518.    The Oregon State Hospital has been unresponsive to the various lawsuits and court orders and has ignored existing constitutional, legal, and medical parameters for treatment for many decades. Whether the State of Oregon refused to adequately fund the Oregon State Hospital or there is some other more insidious motive, the result is the same: people will continue to be mistreated and abused and die without some lasting impactful change.

519.    Without substantial change, more patients will die, more patients will be subject to abusive and inconceivable inhuman treatment, and the Oregon State Hospital will believe it is beyond the law and medicine.

520.    Plaintiffs request injunctive and declaratory relief on behalf of the Estate and for society in general in keeping with the basic concepts of constitutional claims that claims under 42 U.S.C. § 1983 are to benefit society as a whole. Society is harmed where the state mental health hospital repeatedly and continuously abuses, mistreats, and causes the death of vulnerable and voiceless mentally ill patients.

521.    Plaintiffs seek declarations that the conduct described in this Complaint constitute a deprivation of patients' rights and cause harm.

522.    Plaintiffs seek injunctive relief against the State of Oregon and the Oregon Health Authority and Oregon State Hospital as follows:

a.    Court findings against the Oregon State Hospital of long term failures to provide standard of care to patients, misuse of psychiatric treatments protocols including over medication, ignoring statutory and constitutional mandates, extraordinary use of isolation and four-point restraint, failure to provide adequate outside review of patient care, failure to comply with court orders, and failure to comply with orders by outside auditors.

b.    Appointment of a Special Master to oversee a review of policies and procedures at the Oregon State Hospital through the use of an outside panel of experts in the psychiatric protocols at issue and the repeated unchecked failures of Oregon State Hospital , to authorize and oversee a chart review and to design any new recommended protocols.

c.    If the outside panel of experts recommends changes or adjustments, the Special Master will oversee the implementation and monitoring of compliance.

## PUNITIVE DAMAGES

523.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

524.    Defendants' actions demonstrate a reckless and outrageous indifference to a highly unreasonable risk of harm in acting with the conscious indifference to the safety of Plaintiff Estate of Kenneth Hass and the public.

525.    Plaintiff Estate of Kenneth Hass is entitled to seek punitive damages pursuant to 42 U.S.C. § 1983. Plaintiff Estate of Kenneth Hass demands punitive damages against Defendants in amounts to be determined at trial.

## JURY DEMAND

526.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

527.    Plaintiffs demand a trial by jury of all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Estate of Kenneth Hass prays for judgment against Defendants as follows:

a.    For its noneconomic losses in an amount that a jury determines is fair and reasonable, but greater than $75,000;

b.    For its economic losses in an amount that a jury determines is fair and reasonable, but greater than $75,000;

c.    For treble damages pursuant to ORS 124.100(2)(a) & (b);

d.    For punitive damages in an amount that a jury determines is fair and reasonable, but greater than $75,000;

e.    For attorney fees pursuant to 42 U.S.C. § 1988;

f.    For attorney fees pursuant to ORS 124.100(2)(c);

g.     For fees for the service of a personal representative pursuant to ORS 124.100(2)(d);

h.     For costs and disbursements incurred herein;

i.     For interest according to law; and

j.     For such other relief as the court deems just, including declaratory and injunctive relief.

Plaintiff Sierra Hass prays for judgment against Defendant State of Oregon as follows:

a.     For her noneconomic losses in an amount that a jury determines is fair and reasonable, but greater than $75,000;

b.     For her economic losses in an amount that a jury determines is fair and reasonable, but greater than $75,000;

c.     For costs and disbursements incurred herein;

d.     For interest according to law; and

e.     For such other relief as the court deems just, including declaratory and injunctive relief.

DATED this 13th day of July, 2026.

D'AMORE LAW GROUP, P.C.

By:   *s/ Benjamin Turner*
Thomas D'Amore, OSB No. 922735
Email: tom@damorelaw.com
Benjamin Turner, OSB No. 144503
Email: ben@damorelaw.com
Amy Bruning, OSB No. 175811
Email: amy@damorelaw.com
4230 Galewood Street, Suite 200
Lake Oswego, OR 97035
Telephone: (503) 222-6333

LAW OFFICE OF MICHELLE R. BURROWS P.C.

By:     *s/ Michelle Burrows*
Michelle Burrows, OSB No. 861606
Email: michelle.r.burrows@gmail.com
16869 SW 65th Ave # 367
Lake Oswego OR  97035
Telephone: (503) 241-1955

*Attorneys for Plaintiffs*